**Kim R. PATTEE, Appellant,**

v.

**Richard PATTEE, Appellee.**

**No. S-1651.**

Supreme Court of Alaska.

Oct. 30, 1987.

G.R. Eschbacher, Anchorage, for appellant.

Dan W. Allan, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This appeal concerns the property division and child support award made as part of the divorce of Kim Pattee (appellant) from Richard Pattee (appellee). Kim contends that the trial court erred in finding that Richard's sale of a marital asset to his brother immediately after service of the divorce complaint was not intended to defraud her of her fair share of the property. She also argues that the court erred in basing the child support award on Richard's income after he had voluntarily cho-

sen to give up a lucrative job to become an unemployed student.

## I. FACTS

Kim married Richard in Washington State in 1979. They had two children, a son born in 1979 and a daughter born in 1984.

In 1982 Richard's stepfather gave Richard and his brother John an interest in a gold mine. Kim and Richard subsequently sold their Anchorage home, and used the profit from the house sale to support them while Richard worked with John at the mine. The brothers sold the mine in November 1982 for a total profit of about $125,000.

Some of the profit was apparently used to purchase cars and to support Kim, Richard and John during a subsequent mining venture. Richard and John invested the remainder of the profit, about $109,000, in an Anchorage bar (the Union Club, now called The Avenue) in a joint venture with their mother.[1] Half of this money, or $54,500, was Richard's.

Richard and John paid $800,000 for the Union Club. Richard originally took a one-half interest in the bar, but reduced his interest to one-third by the end of 1984. By December 31, 1984, the partners had reduced the mortgage owed on the bar to $590,480.96. In addition, they had invested $73,000 in bar improvements.

Kim filed for divorce on December 26, 1984. On December 31, 1984, Richard executed a contract selling his interest in The Avenue to his brother for $54,500, payable by an unsecured, non-transferable promissory note due over a ten-year term. This contract was not recorded. It was not disclosed to Kim or to the divorce court until June 1985.[2] Richard continued to work at the bar; he took partnership draws of more than $3,000 per month through April 1985.[3] Subsequently, Richard quit work, moved to Seattle and became a student at Tacoma Community College. At the time of trial, Richard lived with his sister rent-free and received an allowance of $1,000 per month, plus his tuition expenses, from his mother.

On January 4, 1985, a few days after the undisclosed sale, Kim obtained a temporary restraining order preventing Richard from selling or encumbering his assets, including his interest in the bar, and providing interim child support. The parties were divorced on July 16, 1985, under an interim decree that left open the property settlement and child support questions.

After a three-day bench trial, the court found that Richard's sale of his interest in the bar was made at fair market value and was not fraudulent to Kim. The court divided the remaining payments due on John's promissory note to Richard (totalling $44,000) equally between the two parties. The court then found that Richard's only income was his half of the payments on this note, or $326 per month. It ordered Richard to pay this sum as child support ($163 per month per child).

## II. FRAUDULENT CONVEYANCE OF "THE AVENUE"

Kim argues that Richard's secret conveyance of his interest in The Avenue to his brother three days after receiving ser-

---

1. There is no evidence that the mother invested any money in the venture; however, she apparently took a 50% interest in the real property.

2. Richard's attorney at the time of the sale was James Babb. At trial, Babb testified that he believed that the alleged sale was invalid and that "to have attempted to dissipate assets in that way would have gotten my client [Richard] into more difficulty than he might already be." Accordingly, Babb instructed Richard and John to treat the sale as null and void. On May 14, 1985, John Pattee submitted an affidavit stating that Richard owned a one-third interest in the liquor license and a 25% interest in the land and building. Moreover, the Alaska liquor license for 1985 was in the names of Richard Pattee and John Pattee. Thus, the "sale" did not come to the attention of the court until approximately June 24, 1985, when Richard stated in an affidavit that his partner had filed suit to enforce the sale. The suit was dismissed shortly after Kim sought to intervene.

3. A "Monthly Cash Flow Analysis" of The Avenue shows Richard receiving draws of $3,500, $4,650, $3,300 and $3,125 between January 1985 and April 1985. It also shows payments to the Internal Revenue Service on his behalf in this period of $7,771.

vice of divorce papers was intended to defraud her of her fair share of a primary marital asset.

Alaska Statute 34.40.010, the Fraudulent Conveyance Act, provides:

A conveyance or assignment, in writing or otherwise, of an estate or interest in lands, or in goods, or things in action, or of rents or profits issuing from them or a charge upon lands, goods, or things in action, or upon the rents or profits from them, made with the intent to hinder, delay, or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts, or demands, or a bond or other evidence of debt given, action commenced, decree or judgment suffered, with the like intent, as against the persons so hindered, delayed, or defrauded is void.

A conveyance of marital property made in anticipation of a divorce may be set aside as fraudulent. *Gabaig v. Gabaig,* 717 P.2d 835, 837–38 (Alaska 1986). In *Gabaig,* the husband, in anticipation of divorce, secretly conveyed marital property through a "straw man" to his son by a prior marriage. We affirmed the trial court's finding that the transfer was fraudulent and therefore void under AS 34.40.010. The key attribute of fraudulent conveyances is that they are made with the intent to defraud. Existence of fraudulent intent is a question of fact. *Id.* at 838. We will not set aside a determination of fraudulent intent unless, upon our reading of the record as a whole, we are left with the "definite and firm conviction that a mistake has been made." Alaska R.Civ.P. 52(a); *Williams v. Alyeska Pipeline Service Co.,* 650 P.2d 343, 347 (Alaska 1982).

In *Gabaig,* we identified eight "badges of fraud" which may provide circumstantial evidence of a fraudulent conveyance: inadequate consideration; transfer in anticipation of an impending suit; insolvency of the transferor; failure to record; a transfer encompassing substantially all of the transferor's property; a transfer completely depleting the transferor's property; and the relationship between the parties to the sale. 717 P.2d at 839 n. 6. Not all the "badges" need be present to affirm a finding of fraud. *Id.* at 839 n. 8.

The court below concluded that Richard's sale of his interest in The Avenue was not intended to defraud Kim because it found that the sale was made at fair market value and that Richard did not retain an interest in the property after the sale. Neither of these findings is supported by substantial evidence in the record. Our reading of the record leaves us with the definite and firm conviction that Richard intended to defraud Kim when he sold his interest in The Avenue.

(1) Fair Market Value of Richard's Interest in The Avenue

Richard sold his interest in The Avenue to his brother John for an unsecured, nontransferable note for $54,500 payable over 10 years at 10% interest.[4] Expert testimony established that the value of such a note, even if it were transferable and fully secured, was at most 60–72% of its face value. In reality, the sale brought less than $39,240 (72% of $54,500).[5]

Kim provided expert testimony from an accountant that the value of Richard's interest in The Avenue on December 31, 1984 was $132,000.[6] This value was based on the "capitalization of earnings method" for the value of the liquor license and good will, plus the cost value of the real property. In *Rostel v. Rostel,* 622 P.2d 429, 430 (Alaska 1981), we held that the value of a close corporation, held as marital property

---

**4.** The price was apparently set as being one-half of the initial investment of $109,000 made by the two brothers. Richard claims that this was the book value of his interest. Richard's accountant testified that this was the value of Richard's partnership capital account.

**5.** The trial court was aware that the present value of the note was much less than its face value, but apparently did not consider this in evaluating whether the sale was made at fair market value.

**6.** Originally, Richard had been ordered to provide an expert appraisal of his interest in The Avenue. This order was apparently vacated, and Richard did not provide any expert testimony on the value of his interest.

by a divorcing couple, properly included the value of its good will as well as the value of its physical property and accounts receivable. *See also Marriage of Foster,* 42 Cal.App.3d 577, 117 Cal.Rptr. 49, 52 (1974); *Marriage of Goger,* 27 Or.App. 729, 557 P.2d 46, 47–48 (1976); *Marriage of Lukens,* 16 Wash.App. 481, 558 P.2d 279, 282 (1976) (professional practices have good will value). The capitalization of earnings method is one generally accepted method for evaluating the good will of a business. *See In re Marriage of Hall,* 103 Wash.2d 236, 692 P.2d 175, 179 (1984). *See generally* Comment, *The Recognition and Valuation of Professional Goodwill in the Marital Estate,* 66 Mar.L.Rev. 697 (1983); Comment, *Identifying, Valuing, and Dividing Professional Goodwill as Community Property at Dissolution of the Marital Community,* 56 Tul.L.Rev. 313 (1981).

The trial court's finding that the sale was made at fair market value was clearly erroneous for the following reasons: (1) Richard did not even recover the amount of his investment made more than a year earlier; and (2) he got nothing for his share of the good will.

#### (2) Richard's Continued Interest in The Avenue

Richard accepted partnership draws totalling $14,575 in the four months after the sale. Moreover, The Avenue paid $7,771 to the Internal Revenue Service on his behalf during this period. Richard's name also appeared on the liquor license after 1984. In light of this evidence, we believe that the trial court's finding that Richard retained no interest in The Avenue was clearly erroneous.

#### (3) Other Badges of Fraud

The sale was made for insufficient consideration, and Richard maintained at least some interest in The Avenue subsequent to its sale. Other badges of fraud also suggest that Richard intended to defraud Kim of a substantial part of her share of The Avenue.

First, the transfer was made in anticipation of an impending suit. Richard made the sale on December 31, 1984, just three days after Kim had served him with a complaint for divorce. Second, even if the sale did not leave Richard completely insolvent, the record suggests that his remaining assets might be insufficient to provide Kim with her half of the fair market value of the interest in The Avenue. Third, he failed to record the transaction promptly. The most significant portion of the parties' marital estate was sold without the knowledge of the wife or of the court having jurisdiction over the divorce. Fourth, the transfer encompassed substantially all the valuable property held by Richard. Fifth, although the transfer did not entirely deplete his assets (because he was left with the value of the note), it reduced his assets significantly. Moreover, once the note was shared with Kim the income from the remainder was far less than enough to pay his interim child support obligation. Finally, the sale was made to his brother. Richard made it clear that the sales price he negotiated was not the result of arms-length bargaining, stating: "I'm doing business with my family, and I'm not going to sit down there at the table and drive the hardest bargain I possibly can, as I would if I was dealing with somebody like you." Richard also stated, "I was dealing with—with—well, people I loved. People that are related to me. People that wanted nothing but to help me ..." *Id.* at 66.

The record before us leaves us with the definite and firm conviction that Richard intended to defraud Kim of her share of the marital asset. Three days after Richard was served with divorce papers, he "sold" a valuable income-producing property to his brother at a very favorable price. His family now provides him with rent-free accommodation, money and a car. Thus, the trial court's contrary holding was clearly erroneous. *See* Alaska R.Civ.P. 52(a).

Accordingly, we reverse and remand to the trial court for entry of judgment voiding the sale. On remand, the trial court must determine the fair market value of Richard's interest in The Avenue, by including the amount of its business good will and the present value of its assets.

The court should revise the division of property accordingly.

## III. CHILD SUPPORT

The trial court ordered Richard to pay Kim, the custodial parent, $163 per child per month ($326 per month total) in child support. This was the total of Richard's income from the note given for his interest in The Avenue after the court divided the note between Kim and Richard. The court found that Richard had no other income except gifts from his mother, while Kim earned $1,340 (net) per month.

The trial court has broad discretion to order child support payments "by either or both parties ... as may be just and proper ..." AS 25.24.160(a)(1); *see Curgus v. Curgus*, 514 P.2d 647, 649 (Alaska 1973). The relevant factors in allocating child support are the total costs of supporting the children and the relative financial position of the parties. *Hunt v. Hunt*, 698 P.2d 1168, 1172 (Alaska 1985). We will not reverse a child support award unless we have a definite and firm conviction based on the record as a whole that a mistake has been made or the trial court abused its discretion. *Id.*

We must reverse this child support award for three reasons. First, our decision to void the sale of Richard's interest in The Avenue means that Richard will no longer receive income pursuant to the terms of the note he received on that sale, but as a partner in the bar. Second, the trial court clearly erred in failing to consider as part of Richard's available income the $1,000 monthly allowance he receives from his mother.

Finally, we reject the trial court's implicit holding that a noncustodial parent who *voluntarily* reduces his or her income should automatically receive a corresponding reduction in his or her child support obligation.[7] Many courts hold that a voluntary reduction in an obligor-parent's income does not reduce a child support obligation. *See, e.g., Villano v. Villano*, 98 Misc.2d 774, 414 N.Y.S.2d 625, 629 (N.Y.Sup.Ct.

1979); *Miller v. Miller*, 65 Ill.App.3d 844, 22 Ill.Dec. 433, 382 N.E.2d 823, 826 (1978); *see generally* Annotation, *Change in Financial Condition or Needs of Parents or Children as Ground for Modification of Decree for Child Support Payments*, 89 A.L.R.2d 7, 54–58 (1963). On the one hand, we do not believe that an obligor-parent should be "locked in" to a particular job or field during the minority of his or her children when accepting a lower-paying position may ultimately result in personal or professional advancement. *Weiser v. Weiser*, 238 Pa.Super. 488, 362 A.2d 287, 288–89 (1976). On the other hand, the children of the marriage and the custodial parent should not be forced to finance the noncustodial parent's career change. We believe that the better rule is that stated by the Montana Supreme Court: "[T]he judge [is] to consider the nature of the changes and the reasons for the changes, and then to determine whether, under all the circumstances, a modification is warranted." *In re Marriage of Rome*, 621 P.2d 1090, 1092 (Mont.1981). We see no reason why this principle should not extend to initial child support award determinations. *Hunt*, 698 P.2d at 1172 (regarding the equitable allocation of costs of raising children).

The record does not disclose why Richard has become a student, how long he anticipates being unemployed, or what his eventual career goals are. We believe that these are circumstances which will be relevant to determining his income for the purpose of establishing his child support obligation.

Accordingly, we remand this case to the trial court for its determination of the reasonable needs of the children, the income available to both parents which may be used to meet those needs, and the appropriate child support award.

**REVERSED and REMANDED.**

7. Shortly after this divorce action was filed, while Richard was drawing more than $3,000 per month from The Avenue, Kim obtained an interim child support award of $600 per child per month. Richard later stipulated to payment of $350 per child per month.