909 P.2d 602

**Donald T. MARKHAM, Plaintiff–Appellant,**

v.

**Iris M. MARKHAM, Defendant–Appellee.**

**No. 17037.**

Intermediate Court of Appeals of Hawaiʻi.

Jan. 9, 1996.

Certiorari Denied Jan. 29, 1996.

Stephen T. Hioki, on the briefs, Honolulu, for plaintiff-appellant.

Bruce B. Kim (Kim & Kim, of counsel), on the brief, Honolulu, for defendant-appellee.

Before WATANABE, ACOBA and KIRIMITSU, JJ.

ACOBA, Judge.

Plaintiff–Appellant Donald T. Markham (Husband) appeals from the family court's March 29, 1993 Divorce Decree and associated rulings. For the reasons stated in this opinion, we remand certain aspects of the case.

Husband was born on May 26, 1936 and Defendant–Appellee Iris M. Markham (Wife) was born on April 25, 1951. Husband met Wife in early 1986. Around September of 1986, Wife moved into Husband's residence at 831 Kahena Street (the Kahena property) located in Honolulu, Hawai'i.[1] Husband's mother, Margaret Shizuko Markham (Mother), had leased the Kahena property on March 6, 1973 from the Estate of Bernice Pauahi Bishop (Bishop Estate).

On December 2, 1987, Mother assigned and transferred the Kahena property to herself, Husband, and Donnette Markham, Husband's daughter from another marriage (Daughter), as joint tenants.

Husband, as a co-mortgagor with Mother, obtained a second mortgage loan on the Kahena property on December 14, 1987. On February 16, 1988, Mother, Husband, and Daughter purchased the Kahena property's fee simple interest from Bishop Estate under an Agreement of Sale. Husband and Mother resided on the Kahena property, maintained it, and made property tax and mortgage payments for the property.

In an Assignment of Lease and Consent dated May 2, 1988 (the Assignment), Mother and Husband purportedly transferred their interests in the Kahena property to Daughter.

In May 1989, Husband applied for and purchased homeowner's insurance in his name as co-owner of the property and paid the insurance premiums.

Husband and Wife were married in Honolulu, Hawai'i on May 26, 1990. Wife assisted in maintaining the Kahena property and contributed to the living expenses of the parties. Wife initially provided care for Mother, and later, paid $500.00 a month for a full-time live-in aide to care for Mother. Wife paid the aide from December 1988 to February 1991, after which time Mother was hospitalized. Wife worked at several jobs.

On April 15, 1991, Wife filed a temporary restraining order (TRO) against one Angel L. Hernandez (Hernandez). The TRO stated that Wife had an extramarital relationship with Hernandez.

Husband and Wife separated on October 16, 1991.

Husband filed a complaint for divorce on November 7, 1991. The couple had no children from their relationship.

The Kahena property was destroyed by a fire in December 1991. Husband claimed reimbursement of $28,000.00 under his homeowners' insurance for damages caused by the fire. In February 1992, Husband, as co-

---

1. Although the family court's May 14, 1993 Findings of Fact and Conclusions of Law state that Defendant–Appellee Iris M. Markham (Wife) moved into the Kahena Street residence around September 1986, both parties testified at the divorce hearing that Wife moved into the residence in June 1986.

owner with Daughter, signed a contract to rebuild the Kahena house.

On February 24, 1992, the court issued a Stipulated Order for Pre–Decree Relief (the Stipulated Order). The Stipulated Order provided in pertinent part that both parties were "enjoined and restrained" from "transferring, encumbering, wasting or otherwise disposing of any real or personal property."

In May 1992, Husband recorded the Assignment in the Bureau of Conveyances. On September 15, 1992, Wife filed a Motion and Affidavit for Relief After Order or Decree (the September 15, 1992 Motion), alleging that the Assignment filed in May 1992 violated the Stipulated Order. An Order Granting [Wife's] September 15, 1992 Motion was entered on October 15, 1992 (the October 15, 1992 Order), on the ground that Husband violated the prohibition against transferring, encumbering, wasting or otherwise disposing of any real property. The October 15, 1992 Order stated that the Assignment was a nullity for purposes of the divorce proceeding, but the Order was without prejudice to Husband "offering proof, if any, at the time of trial that he own[ed] no interest" in the Kahena property.

In December 1992, Mother died.

At a February 12, 1993 pretrial hearing, the court held that, based on the October 15, 1992 Order, "no evidence regarding the [A]ssignment" would be admitted at the divorce trial. The court also granted Wife's February 10, 1993 Motion in Limine to Bar Evidence of [the] Temporary Restraining Order which contained evidence of Wife's infidelity. Further, the court reserved judgment on Wife's Motion in Limine to Bar [Husband] from Adducing Hearsay Testimony of His Mother's Intent to convey the Kahena property to Daughter.

The divorce trial took place on February 16 and 19, 1993. Husband attempted to introduce evidence through two witnesses that Wife married him only for his money and his portion of the Kahena property. The court struck such evidence on the ground that it was not relevant to a division of the marital estate.

Husband also sought to demonstrate that he had no interest in the Kahena property. He maintained that Daughter owned the Kahena property, and pursuant to a "verbal agreement" between the two of them, she allowed him to live on the property on the condition that he pay for the first mortgage and the leasehold fee conversion. The court allowed Husband to testify that he attempted to remove his name as a titleholder from the Kahena property. However, the court sustained Wife's objection to any reference to the Assignment which was declared "a nullity" by the October 15, 1992 Order. The court allowed Husband's testimony "as to his state of mind ... however relevant or irrelevant that may be." The court, additionally, granted Wife's Motion in Limine to Bar [Husband] from Adducing Hearsay Testimony of His Mother's Intent to convey her interest to Daughter. Daughter, however, was permitted to testify that she owned the Kahena property and was making the second mortgage payments on the home. She also indicated that Husband was paying for the first mortgage loan and the "leasehold conversion."

Husband owned a 25% stock interest in Maile, Inc. (Maile), a company that owned and operated a tuna fishing ship. Wife's witness, David Matsuo Chinaka (Chinaka), a certified public accountant (CPA), testified to the "gross earnings" Maile generated for the period of December 1988 through May 1992. However, neither party presented any testimony on the value of Husband's stock at the time of separation or at the time of the trial.

On May 14, 1993, the court rendered its decision awarding Husband "his one-half (½) interest" in the Kahena property subject to an equalization payment of $42,800.00 to Wife. The court based the equalization payment on the period "from the time [Husband] acquired his interest in the home to the date of separation," thus, including the period of the parties' premarital cohabitation in its calculation. The court also awarded Husband "his twenty-five percent (25%) interest in Maile, Inc." subject to an equalization payment of $4,125.00 to Wife. The court based the equalization payment on the length of time Husband owned the stock and "the

length of the parties' relationship." Finally, the court awarded attorney's fees and costs to Wife.

Husband subsequently appealed.

We consider Husband's points on appeal.

### I.

■ Initially, we examine whether the family court erred in striking the testimony of two witnesses regarding Wife's alleged pecuniary purpose in marrying Husband and in barring receipt of Wife's April 15, 1991 TRO into evidence.

■ Hawai'i Revised Statutes (HRS) § 580–47 (1993) affords the family court authority, "[u]pon granting a divorce" decree, to distribute marital property "just[ly] and equitabl[y]." In determining the division of marital property, however, it is well-settled that one spouse's personal conduct or misconduct towards the other spouse is irrelevant. *Richards v. Richards,* 44 Haw. 491, 509, 355 P.2d 188, 198–99 (1960). *See Horst v. Horst,* 1 Haw.App. 617, 624, 623 P.2d 1265, 1271 (1981) ("[f]ault pertaining to personal conduct" of the parties towards each other is not a factor in the determination of marital property division). Although HRS § 580–47 allows the court to consider the "respective merits of the parties" when determining marital property division, "respective merits" is "pertinent only in connection with division of property" and does not refer to the personal conduct of a spouse. *Richards,* 44 Haw. at 509, 355 P.2d at 198.

Husband's reliance on *Carson v. Carson,* 50 Haw. 182, 436 P.2d 7 (1967) and *Horst* is misplaced. In *Carson,* the Hawai'i Supreme Court held that "a spouse's contribution to, or assistance in the accumulation or preservation of, the separate property of the other [spouse]" is a proper factor to consider in dividing property. *Id.* at 185, 436 P.2d at 10. Following *Carson,* this court held that "a spouse's negative effect on the accumulation or preservation of the separate property of the other spouse is also an appropriate consideration." *Horst,* 1 Haw.App. at 624, 623 P.2d at 1271.

The holdings in *Carson* and *Horst* address the effect a spouse's conduct may have on the accumulation or preservation of the other spouse's separate property. The record is devoid of any evidence demonstrating that Wife's alleged premarital "intentions" or her extramarital relationship negatively affected "the accumulation or preservation" of Husband's separate property. Accordingly, we hold that the family court did not abuse its discretion in striking the testimony regarding Wife's alleged purpose for marrying Husband and barring admission of the TRO into evidence.

### II.

Next, Husband argues that the Assignment transferred his and Mother's interests in the Kahena property to Daughter in May 1988, leaving him with no interest in the property. As previously indicated, the Assignment was filed in the Bureau of Conveyances on May 14, 1992. Husband contests the rulings: (1) granting Wife's September 15, 1992 Motion; (2) "nullifying" the Assignment conveying his interest in the Kahena property to Daughter; (3) granting Wife's Motion in Limine to Bar [Husband] from Adducing Hearsay Testimony of His Mother's Intent; and (4) precluding receipt of the Assignment into evidence at trial.

Wife's September 15, 1992 Motion sought to enforce the Stipulated Order. The Stipulated Order stated in relevant part:

I. RESTRAINING ORDERS: *Until further order of the Court,* the parties are enjoined and restrained:

a. *From transferring, encumbering, wasting or otherwise disposing of any real or personal property,* except as necessary, over and above current income, for the ordinary course of business or for usual living expenses[.]

(Emphases added.)

The October 15, 1992 Order, granting the above motion, "nullified" the Assignment on the ground that it violated the Stipulated Order. The October 15, 1992 Order stated:

1. The Assignment of Lease and Consent dated May 2, 1988 recorded by [Husband's] counsel on May 14, 1992 at the Bureau of Conveyances of the State of

Hawaii [Hawai'i] as Document No. 92–076202 affecting the property located at 831 Kahena Street, Honolulu, Hawaii [Hawai'i], TMK No. 1–3–9–49–64, violates the terms and conditions of the Stipulated Order for Pre–Decree Relief entered herein on February 24, 1992 which specifically prohibited [Husband] from transferring, encumbering, wasting or otherwise disposing of any real property until further order of the Court;

    2. *Said Assignment of Lease and Consent is hereby declared a nullity and of no effect for purposes of the above-entitled proceeding;*

    3. *[Wife's] motion is granted without prejudice to [Husband] offering proof, if any, at the time of trial that he owns no interest of any kind* or nature in the aforesaid property[.]

(Emphases added.)

### A.

■ Insofar as the October 15, 1992 Order rested on Husband's recordation of the Assignment at the Bureau of Conveyances on May 14, 1992, we hold that the recording of a conveyance does not result in "transferring, encumbering, wasting or otherwise disposing of any real property."

■ A document or instrument is considered recorded when it is "commit[ted] to writing, ... printing, ... or the like[,]" or "transcribe[d], or enter[ed] in a book, file, docket, register, computer tape or disc, or the like, for the purpose of preserving authentic evidence ... [and] for the purpose of giving notice." *Black's Law Dictionary* 1273 (6th ed. 1990). Under HRS § 502–31 (1993), the regular system of recordation which applies to the Kahena property, requires that the registrar of the bureau of conveyances

record instruments as directed under the statute.[2] In that connection, HRS § 502–31 describes "recording" as making "an entire literal copy of all instruments required to be recorded." HRS § 502–31. Each instrument presented for recording must contain a certificate of acknowledgment verifying the identity of the person executing the instrument. HRS § 502–41 (1993). "The main object of a certificate [of acknowledgment] is to guard the public against false impersonation and to make sure that the grantor executed the deed.... Executing a deed implies that it is executed for the uses and purposes it expresses." *Hawaiian Trust & Inv. Co. v. Barton,* 16 Haw. 294, 300 (1904).

■ The central purpose of recording a conveyance of real property is to give notice to the general public of the conveyance and to preserve the recorded instrument as evidence. *See* HRS §§ 502–81 (1993),[3] 502–82 (1993), and 502–83 (1993). *See also Bottomley v. Hall,* 18 Haw. 412, 413 (1907) (stating that a deed executed by a corporation, acting through its president and secretary that bore "the imprint of its seal and was acknowledged and recorded," was "prima facie sufficient" for receipt of the deed into evidence "without further proof."). Under the appropriate circumstances, the original or a certified copy of a duly recorded instrument would be admissible as prima facie evidence of the conveyance. HRS § 502–82 provides that the record of a duly recorded instrument may be read into evidence:

    **§ 502–82 Record or copy as evidence.** *The record of an instrument duly recorded, or a transcript thereof, duly certified, may also be read in evidence, with like force and effect as the original instrument. Neither the certificate of acknowledgment, nor the proof of any instrument, is conclusive, but may be rebutted, and the force*

---

**2.** Hawai'i Revised Statutes (HRS) § 502–31 (1993) sets forth the following method of recording:

    **§ 502–31 Recording, method.** The registrar shall make or cause to be made an entire literal copy of all instruments required to be recorded in the registrar's office, and the registrar, the registrar's deputy, or clerk shall certify its correspondence with the original, after which the registrar, the registrar's deputy, or clerk shall certify upon the exterior, or indorse

upon the recorded instrument, the date of its registry and the document number.

**3.** HRS § 502–81 (1993) provides that "[e]very conveyance or other instrument, acknowledged or proved, and certified in the manner hereinbefore prescribed, by any of the officers before named, *may be read in evidence without further proof thereof,* and is entitled to be recorded." (Emphasis added.)

and effect thereof may be contested by any party affected thereby. If the party contesting the proof of an instrument makes it appear that the proof was taken upon the oath of an interested or incompetent witness, neither the instrument nor the record thereof shall be received in evidence until established by other competent proof.

(Emphasis added.)

■ Under HRS § 502–83, the failure to record a conveyance voids it *only* as against a subsequent good faith purchaser, lessee, or mortgagee who gives valuable consideration and without actual notice of the conveyance.[4]

■ It has also been held that even without recordation, " '[a] deed apparently valid upon its face carries with it a presumption of validity' " as between the parties to a deed. *Chun Chew Pang v. Chun Chew Kee,* 49 Haw. 62, 71, 412 P.2d 326, 332 (1966) (quoting *McElroy v. Calhoun,* 177 Okla. 38, 57 P.2d 827, 828 (1936)). "Even if the deed had no acknowledgment, or its equivalent, at all, it would still be good between the parties. As between the parties acknowledgment of a deed is not necessary." *Meheula v. Pioneer Mill Co.,* 17 Haw. 56, 58 (1905) (citing *Laanui v. Puohu,* 2 Haw. 161 (1859)). *See also In re Nelson,* 26 Haw. 809, 820 (1923); *Aiau v. Kupau,* 4 Haw. 384, 385 (1881) (holding that recording is notice to one bound to search the record).

By definition, recordation in and of itself does not involve the "transferring, encumbering, wasting or otherwise disposing of any real property." Recordation merely provides notice of a conveyance to third parties and evidence of the conveyance. Consequently, the October 15, 1992 Order should not have concluded that the Assignment "dated May 2, 1988 recorded by [Husband's] counsel on May 14, 1992" violated the Stipulated Order.

B.

■ Assuming that the October 15, 1992 Order was based on the premise that an assignment of Husband's and Mother's interests had occurred, the Order may also have been in error. On its face, the Assignment was dated May 2, 1988, more than four years prior to the date of the Stipulated Order and the September 15, 1992 Motion. There is no evidence in the present record that the Assignment actually took place after the date of the Stipulated Order. *Cf. Boteilho v. Boteilho,* 58 Haw. 40, 44 & n. 1, 564 P.2d 144, 146–47 & n. 1 (1977) (holding that "delivery of a deed is essential to its validity" and the "fact of recordation ... is not conclusive evidence" of delivery). On the state of the record, the Stipulated Order's prohibition against transferring, encumbering, wasting or otherwise disposing of any real property could only apply prospectively and not retrospectively to May 2, 1988.

C.

The October 15, 1992 Order resulted in inconsistent application. Although paragraph two of the October 15, 1992 Order explicitly "declared" the Assignment to be "a nullity and of no effect for purposes of the above entitled proceeding," paragraph three stated that the order was "without prejudice to [Husband] offering proof, if any, at the time of trial that he own[ed] no interest of any kind or nature" in the Kahena property. The Order, thus, permitted Husband to offer "proof ... at the time of trial that he own[ed] no interest of any kind" in the Kahena property, but on the other hand, prevented him from introducing the critical document (i.e. the Assignment) which Husband relied on as "proof" that he had transferred his interest in the said property.

Consequently, the court ruled at the February 12, 1993 pretrial hearing, that "[t]here would [be] no evidence regarding the [A]s-

---

4. HRS § 502–83 (1993) states the following:

§ 502–83 **Effect of not recording deeds, leases, etc.** All deeds, leases for a term of more than one year, mortgages of any interest in real estate, or other conveyances of real estate within the State, shall be recorded in the bureau of conveyances. *Every such conveyance not so recorded is void as against any*

subsequent purchaser, lessee, or mortgagee, in good faith and for a valuable consideration, not having actual notice of the conveyance of the same real estate, or any portion thereof, or interest therein, whose conveyance is first duly recorded.

(Emphasis added.)

signment" at the trial because the October 15, 1992 Order "speaks for itself."[5] The court then declared the Assignment inadmissible as evidence at trial because it was "subject" to the October 15, 1992 Order. As a result, Husband was barred from presenting the Assignment as "proof" of his lack of interest in the Kahena property.

### D.

At the trial, Husband testified that he attempted to remove his name as a titleholder of the Kahena property.

Q. [Husband's counsel] Now, at any time after December of 1987 did you attempt to have your name removed from any documents indicating that you were the owner of 831 Kahena Street?

A. [Husband] Yes.

I realized that I was on title only on paper. And it was my mother's expressed desire and wish—

[Wife's counsel]: Objection, your Honor. That's hearsay.

THE COURT: Yeah. We talked about this earlier.

. . . .

Q. My question is, did you ever attempt to remove your name for [sic] the title?

. . . .

A. About ... May of 1988 I believe.

Wife's counsel objected to this line of questioning because the Assignment had been declared "a nullity" in the October 15, 1992 Order. The court sustained the objection but allowed testimony concerning Husband's "state of mind, however relevant or irrelevant that may be."

[Wife's counsel]: Your Honor, I'm going to object this line of questioning. *It's again going towards that document which has already been declared a nullity in this case. And to hearsay testimony concerning the making of that ... document.*

[Husband's counsel]: Well, it wouldn't be hearsay. He was there, your Honor. And it shows his actions. The document itself has been ruled by the Court not to be a conveyance for the purposes of the case.

However, in terms of his understanding, his actions would be corroborative of ... his understanding, not his mother's—of what he owned and did not own.

[Wife's counsel]: *It's—it's a nullity. . . .* [I]t has no force and effect in this particular case in any—

THE COURT: *And the Court will treat it as such.* Nonetheless, I'll hear what he has to say.

[Husband's counsel]: Okay. Thank you.

THE COURT: Going as to his state of mind ... however relevant or irrelevant that may be.

(Emphases added.)

Wife's counsel objected to Husband's insistence that the property belonged to Daughter.

Q. [Husband's counsel] Now, in attempting to remove your name from the title, what was your understanding of who was to remain on the title?

A. [Husband] ... As I mentioned earlier, mom desired and she had wished—

[Wife's counsel]: Objection, your Honor.

. . . .

THE COURT: Mr. Markham, we've already talked about that whole issue about what your mom desired and what she said. And I found that ... will not be admitted into evidence. So, you can't talk[ ] about that, okay[?]

THE WITNESS [Husband]: Yes, your Honor.

. . . .

Q. Okay. And to your understanding who was to be on title?

---

5. The February 12, 1993 pretrial hearing took place before the same judge who conducted the trial on February 16 and 19, 1993. A different judge granted the October 15, 1992 Order.

Also at the February 12, 1993 hearing, the judge reserved ruling on [Wife's] Motion in Limine to Bar [Husband] from Adducing Hearsay Testimony of His Mother's Intent regarding Husband's interest in the Kahena property. The court granted this motion at trial on February 16, 1993. In light of our rulings concerning the October 15, 1992 Order, we need not reach any issue presented by the motion in limine to bar evidence of Mother's intent.

A. My daughter D[o]nnette Markham.

Q. Okay. Was there suppose[d] to be anyone else on title with D[o]nnette?

A. No, sir.

Because the court had held that the Assignment was a nullity, we cannot determine from the record how the family court proposed to weigh Husband's testimony or determine its materiality in light of its ruling that Husband's testimony went only "to [Husband's] state of mind, however relevant or *irrelevant* that may be." (Emphasis added.)

### E.

■ The Assignment was duly recorded. As we earlier noted, it has been held that under the appropriate circumstances a recorded instrument may be submitted as prima facie evidence of the conveyance. *See* HRS § 502–82; *Bottomley*, 18 Haw. 412. Under HRS § 502–82, a "certificate of acknowledgment complete and regular on its face" raises a rebuttable presumption that the facts stated in it are true. *Chun Chew Pang*, 49 Haw. at 73, 412 P.2d at 332 (citations omitted). It has also been held that even without any acknowledgment, an assignment would be valid as between the parties to the conveyance. *Meheula*, 17 Haw. at 58. Husband was entitled to have the court try the issue of the Assignment's validity with all the other evidence bearing upon his interest or lack thereof in the Kahena property. Consequently, we remand the issue of Wife's entitlement to an equalization payment for Husband's purported Kahena property interest to the family court. Because we do so, we do not reach the question of whether the trial court properly considered the parties' period of cohabitation in calculating the equalization payment. *But cf. Aehegma v. Aehegma*, 8 Haw.App. 215, 797 P.2d 74 (1990) (holding that cohabitation alone does not prove express agreement for equitable division of separate property acquired or im-

proved during cohabitation); *Malek v. Malek*, 7 Haw.App. 377, 768 P.2d 243 (1989) (allowing the family court to consider parties' respective contributions to separate property during both their premarital cohabitation and subsequent marriage in property division upon divorce). We also express no opinion as to the ultimate effect the court should give the purported Assignment on remand. Furthermore, any possible defects in the Assignment instrument must be raised and resolved on remand. Accordingly, we hold that Husband should be afforded the opportunity to prove the validity of the Assignment at trial.

### III.

Additionally, Husband disputes the equalization award to Wife based on Husband's 25% stock interest in Maile. He maintains that there was a lack of evidence as to any appreciation in the value of the stock and as to the value of the stock itself.

Husband is the president, secretary, and treasurer of Maile. Husband acquired Maile stock in 1969 for $2,500. Husband admitted that in December 1986, he submitted a mortgage application listing the value of his stock in Maile at $37,500. At the time of the trial, Husband claimed that Maile had a cash reserve of only $3,800, and a fifty-five to sixty-year old "sandpan [sic]," [6] called the Sea Queen. According to Husband, Maile owed "about twenty thousand dollars," and could not afford to pay the "thirty-eight to forty thousand dollars a year" it cost to insure the sanpan. Husband reported that the Sea Queen was riddled with mechanical problems and was inoperable.

Wife called Chinaka, who was qualified by the court as "an expert in the area of auditing and accounting," to testify. Chinaka reviewed summaries of "approximately … three volumes of records containing … Tropic Fish and Vegetable['s] [7] [financial] computer printouts for the period [of] De-

---

**6.** Husband testified that his "sandpan" [sic] is a "commercial skip jack, tuna fishing" vessel "constructed out of heavy timber or lumber." The correct spelling of "sandpan" is either sanpan or sampan. Webster's Unabridged Third New International Dictionary defines sanpan as "a boat built on oriental lines, propelled by a diesel mo-

tor, and widely used in Hawaiian fishery." *Webster's Third New International Dictionary (Unabridged)* 2008 (1966).

**7.** Tropic Fish and Vegetable appears to be a subsidiary of Maile.

cember 1988 through May of 1992 for the company known as Maile Incorporated[.]" The records had been provided by Husband's CPA at Maile. According to Chinaka, Maile received "total earning[s]" of "four hundred thirty-seven thousand seven hundred ninety-nine dollars and seventy-six cents [ ($437,799.76) ]," with "gross earnings" at "six hundred thirty-nine thousand four hundred twenty-eight [dollars] and two cents [ ($639,428.02) ]" for the period of December 1988 through May 1992. Chinaka opined that Maile generated a positive cash flow during the 1988 to 1992 period. Assuming no other expenses existed, Chinaka believed that the $294,695.63 "figure [on Maile's financial schedules] reflect[s] as close as possible the net profit" for that period of time. "However, since [Chinaka] [did] not have all the other information," he was not able to determine "the general and administrative expenses" of Maile.

Finding of Fact No. 16 established that Husband "own[ed] a twenty-five percent (25%) interest in Maile, Inc. which he acquired before the parties began their relationship [and] [t]he value of Husband's interest in Maile, Inc. is $37,500.00." Conclusion of Law No. 6(b) disclosed that the stock equalization award was "[b]ased upon the length of [Husband's] ownership of said stock and the length of the parties' relationship, [resulting in Wife's] entitle[ment] to ⅟₁₁ of the value of said stock, which equals $4,125.00."

### A.

Hawai'i law adheres to the partnership model in the adjudication of property division in divorce proceedings. *Tougas v. Tougas*, 76 Hawai'i 19, 28, 868 P.2d 437, 446 (1994); *accord Gardner v. Gardner*, 8 Haw. App. 461, 464, 810 P.2d 239, 242 (1991). Thus, "the partnership model is the appropriate law for the family courts to apply when exercising their discretion" in determining the division of marital property. *Id.*

The general partnership law dictates that "each partner is entitled to be repaid his [or her] contributions to the partnership property[.] ... Absent a legally permissible and binding partnership agreement to the contrary, partners share equally in the profits of their partnership, even though they may have contributed unequally to capital or services." *Tougas*, 76 Hawai'i at 27, 868 P.2d at 445 (quoting *Gardner*, 8 Haw.App. at 464, 810 P.2d at 242) (internal citations and quotation marks omitted).

Further, the family courts may use five categories of net market values (NMVs) [8] in determining equitable division and distribution of marital property. *Tougas*, 76 Hawai'i at 26, 868 P.2d at 445; *Gussin v. Gussin*, 73 Haw. 470, 474–75, 836 P.2d 484, 487 (1992); *Gardner*, 8 Haw.App. at 465–66, 810 P.2d at 242; *Malek v. Malek*, 7 Haw.App. 377, 380–81 n. 1, 768 P.2d 243, 246–47 n. 1 (1989). "Despite the inapplicability of the USPs [Uniform Starting Points],[9] the family

---

**8.** The five categories delineated are as follows:

> Category 1. The net market value (NMV), plus or minus, of all property separately owned by one spouse on the date of marriage (DOM) but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
> Category 2. · The increase in the NMV of all property whose NMV on the DOM is included in category 1 and that the owner separately owns continuously from the DOM to the DOCOEPOT [date of the conclusion of the evidentiary part of the trial].
> Category 3. The date-of-acquisition NMV, plus or minus, of property separately acquired by gift or inheritance during the marriage but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.

> Category 4. The increase in the NMV of all property whose NMV on the date of acquisition during the marriage is included in category 3 and the owner separately owns continuously from the date of acquisition to the DOCOEPOT.
> Category 5. The difference between the NMVs, plus or minus, of all property owned by one or both of the spouses on the DOCOEPOT minus the NMVs, plus or minus, includable in categories 1, 2, 3, and 4.

*Tougas v. Tougas*, 76 Hawai'i 19, 27, 868 P.2d 437, 445 (1994) (quoting *Malek v. Malek*, 7 Haw. App. 377, 380–81 n. 1, 768 P.2d 243, 246–47 n. 1 (1989)).

**9.** The Hawai'i Supreme Court abolished Uniform Starting Points (USPs), holding that USPs violate HRS § 580–47 and "unduly restrict the family court's discretion in determining the equitable division and distribution of the marital estate." *Tougas*, 76 Hawai'i at 27, 868 P.2d at 445 (citing

court is not without any direction in determining the equitable division and distribution of marital estates in that the family court can still utilize the construct of five categories of net market values (NMVs) in divorce cases[.]" *Tougas,* 76 Hawai'i at 27, 868 P.2d at 445 (footnote added).

### B.

Using the five-category net market value construct to determine an equitable marital division of the stock interest, Husband's stock in Maile may be classified under Category 1 as "property separately owned by one spouse on the date of marriage." The appreciated value of the said stock would fall into Category 2 as "[t]he increase" in the net market value of property which the owner separately owned from the date of marriage to the date of the trial's conclusion. *See Tougas; Malek.*

Appreciation is equivalent to the profits in a partnership, and therefore, can be divided in a "just and equitable" manner as the court deems appropriate. The Hawai'i Supreme Court has held that "the trial court may award up to half this [during marriage] appreciation to the non-owning spouse if, under the totality of circumstances, it is just and equitable to do so. The trial court also may determine that a lesser award, or no award, is in order." *Cassiday v. Cassiday,* 68 Haw. 383, 389, 716 P.2d 1133, 1138 (1986). The "appreciation value" of separately owned property at the time of marriage which remains separately owned at the time of the divorce is categorized as "'a marital asset subject to division after consideration of all relevant circumstances of the case.'" *Gussin,* 73 Haw. at 492, 836 P.2d at 495 (quoting *Cassiday,* 68. Haw. at 387, 716 P.2d at 1136) (citation omitted).

We conclude that any appreciation in value of the Maile stock must be considered "a marital asset" under *Gussin* and *Cassiday,* and therefore, subject to division at the court's discretion. *See Gussin,* 73 Haw. at 492, 836 P.2d at 495. However, there was no evidence introduced at trial regarding the appreciation, if any, in the value of the said

stock from the date of marriage (or cohabitation).

### C.

The court's conclusion that Wife was "entitled to ⅟₁₁ of *the value of said stock*" points to an award based on the value of the stock itself, rather than on any appreciation of the stock over a relevant period of time. (Emphasis added.) As a result, we consider whether the court had the discretion to alternatively award Wife an equalization payment based on the entire value of Husband's stock.

Under the partnership model, absent an agreement to the contrary, each partner is entitled to his or her separately owned property. Separately owned property may become marital property if the owner spouse "'gifts'" the property to the other spouse or to the marital estate. *Tougas,* 76 Hawai'i at 31, 868 P.2d at 437 (citation omitted). Here, it is undisputed that Husband's stock was never gifted to Wife or made a part of the marital estate. HRS § 580–47(a), however, vests the family court with broad discretion to divide and distribute the estate of the parties "whether community, joint or *separate*" in a "just and equitable" manner. (Emphasis added.) *See Tougas.* This discretion encompasses the authority to "award separate property to the non-owning spouse." *Cassiday,* 68 Haw. at 387, 716 P.2d at 1136; *accord Myers v. Myers,* 70 Haw. 143, 148, 764 P.2d 1237, 1241, *reconsideration denied,* 70 Haw. 661, 796 P.2d 1004 (1988); *Lewis v. Lewis,* 69 Haw. 497, 504, 748 P.2d 1362, 1368 (1988); *Takara v. Takara,* 4 Haw.App. 68, 71, 660 P.2d 529, 532 (1983). The court, therefore, was empowered to consider Husband's sole property in making an "equalization" award.

### D.

However, Husband argues that the value of the stock was not established for the October 15, 1991 date of separation which the court designated as the termination date of the parties' "economic partnership." Preliminarily, we observe that the family court's

*Gussin v. Gussin,* 73 Haw. 470, 486, 836 P.2d 484, 492 (1992)).

use of the separation date as the termination point of the marriage relationship for the purpose of property division was incorrect. Under "the partnership model of marriage we have accepted[,]" a "final division of marital property can be decreed only when the partnership is dissolved" and not "after a declaration by either [spouse] that the marriage has ended[.]" *Myers*, 70 Haw. at 154, 764 P.2d at 1244. Hence, the termination point of the marriage partnership for purposes of property division is the conclusion of the divorce trial. *Id.* However, any award based on property acquired by a spouse or the appreciation of property between the date of the parties' separation and the conclusion of the divorce trial is a matter left to the court's discretion in determining what "may or may not be just and equitable when all the circumstances are considered[.]" *Id.* at 154 n. 7, 764 P.2d at 1244 n. 7. In this case, we nevertheless agree with Husband that Maile's stock value was not established.

Claiming a lack of funds, Wife "concedes [that] she did not obtain an appraisal of Husband's stock in Maile, Inc." Yet, citing Chinaka's testimony regarding the $639,-428.02 in gross income generated by Maile between December 1988 and May 1992, Wife maintains that "assuming no other general and administrative expenses," Maile "netted $294,695.63 in earnings over the same 3½ year period." The record does not disclose any evidence to support a basis for the assumption that "no other general or administrative expenses" existed. Chinaka testified that since he did not have "all the other information," he was not able to determine Maile's "general and administrative expenses." Even assuming, *arguendo*, that no other expenses existed with respect to Maile, the net earnings over a 3½ year period would not establish the value of Husband's stock.

We also reiterate that the $37,500 value the court used in calculating Wife's award was the value of Husband's stock in 1986, and no value was attributed to the stock at the time of the trial, which occurred some seven years later.

Finally, we note that the amount awarded Wife is not one-eleventh of the purported stock value of $37,500. In using a one-eleventh ratio "[b]ased upon the length of [Husband's] ownership and the length of the parties' relationship," we assume the court based its award on the ratio of Husband's and Wife's roughly 1½ years of marriage to Husband's twenty-two years of stock ownership. However, "¹⁄₁₁ (one-eleventh) of the value of said stock ($37,500)" would be $3,409.09, not $4,125.00.

The record lacks any evidence with respect to the value of Husband's stock at the time of trial. The record is also without a rational basis for the amount of the award. *See Bennett v. Bennett,* 8 Haw.App. 415, 426, 807 P.2d 597, 603–04 (1991). Accordingly, we vacate the family court's award of $4,125.00 to Wife and remand this issue to the family court for re-determination.

## IV.

In conclusion, Husband lists attorney's fees and costs awarded to Wife in his brief's "Statement of Questions Presented," but fails to provide any argument or discussion supporting this point of error. An appellate court may disregard a point of error if the appellant fails to present discernible argument on the alleged error. *Hall v. State,* 10 Haw.App. 210, 218, 863 P.2d 344, 348, *cert. denied,* 76 Hawai'i 246, 868 P.2d 464 (1993). That notwithstanding, we agree with Wife that the award of attorney's fees and costs is within the family court's discretion.

HRS § 580–47 [10] confers broad discretion on the family court in granting an

---

10. Under HRS § 580–47(a)(4) (1993), the family court is authorized to issue orders "allocating, as between the parties, the responsibility for the payment of ... attorney's fees, costs, and expenses incurred by each party by reason of the divorce."

HRS § 580–47(b) (1993) grants the family court further power "to compel either party to advance reasonable amounts for the expenses of the appeal including attorney's fees to be incurred by the other party...."

Finally, HRS § 580–47(e) (1993) provides in relevant part as follows:

Attorney's fees and costs. The court ... may make such orders requiring either party to pay or contribute to the payment of attorney's fees,

award of attorney's fees to one spouse. An award of litigation expenses is within the sound discretion of the family court, subject only to the standard that it is "fair and reasonable." *Farias v. Farias,* 58 Haw. 227, 233, 566 P.2d 1104, 1109 (1977) (citations omitted). Under this standard, "the trial court should consider the financial ability of the parties and the amount necessary for the efficient prosecution or defense of the action." *Id.* Furthermore, an award of attorney's fees is not limited to cover the costs associated with trial litigation. An "[a]llowance of attorney's fees to prosecute an appeal is [also] within the trial court's discretion." *Carson v. Carson,* 50 Haw. 182, 188, 436 P.2d 7, 11 (1967). Because Husband failed to explain how the award of attorney's fees was unreasonable, we affirm the award.

### V.

Based on the foregoing, we (1) vacate the October 15, 1992 Order nullifying the Assignment and the Divorce Decree's (a) equalization payment award to Wife based on Husband's purported interest in the Kahena property and (b) equalization payment award to Wife based on Husband's stock interest in Maile; (2) remand matters (1)(a) and (b) to the family court for proceedings consistent with this opinion; and (3) affirm the Divorce Decree in all other respects.

> costs, and expenses of the other party relating to such motion and hearing as shall appear just and equitable after consideration of the respective merits of the parties, the relative abilities of the parties, the economic condition of each party at the time of the hearing, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case.

1. In *Pattee v. Pattee,* 744 P.2d 658 (Alaska 1987), the wife filed for divorce on December 26, 1984. Five days later, the husband secretly executed a contract selling his interest in a tavern to his brother for $54,500, less than fair market value, payable by an unsecured, non-transferable promissory note due over a ten-year term. The contract was not recorded and not disclosed to the wife or the divorce court until June 1985. Meanwhile, the husband continued to work at the tavern and took partnership draws of more than $3,000 per month through April 1985. Thereafter, he quit work, became a community college student, lived with his sister rent-free, and received an allowance of $1,000 per month, plus his tuition expenses, from his mother.

WATANABE, Judge, concurring and dissenting.

I respectfully disagree with the majority's conclusion in Part II of the opinion that the family court erred in entering its October 15, 1992 Order, nullifying the May 14, 1992 recordation of the May 2, 1988 Assignment of Lease and Consent (Assignment), by which Husband and Husband's mother (Mother) allegedly transferred their leasehold interests in the Kahena Street home (home) to Husband's daughter (Daughter).

### A.

A primary issue at trial was *whether* and, if so, *when* Husband and Mother conveyed their interests in the home to Daughter. Clearly, if Husband had validly conveyed his interest in the home to Daughter prior to commencing divorce proceedings, the home would not be part of the marital estate, subject to distribution by the family court. However, if Husband had not conveyed his interest in the home prior to filing the divorce complaint, any subsequent attempt by him to effectuate a conveyance would have constituted a possible fraudulent conveyance of marital property in anticipation of divorce. *Pattee v. Pattee,* 744 P.2d 658, 660 (Alaska 1987),[1] overruled on other grounds, *Nass v.*

The Supreme Court of Alaska held that the sale by husband of his interest in the tavern was a void fraudulent conveyance. Relying on *Gabaig v. Gabaig,* 717 P.2d 835 (Alaska 1986), the court identified eight "badges of fraud," which may provide circumstantial evidence of a fraudulent conveyance:

> inadequate consideration; transfer in anticipation of an impending suit; insolvency of the transferor; failure to record; a transfer encompassing substantially all of the transferor's property; a transfer completely depleting the transferor's property; and the relationship between the parties to the sale.

744 P.2d at 660. In this case, several of the *Gabaig* indicia of fraud appear to be present: (1) Daughter does not appear to have paid any consideration for the May 2, 1988 Assignment of Lease and Consent (Assignment); (2) Husband failed to list any real property assets in his Asset and Debt Statement, Record on Appeal, vol. 2 at 7, claiming that the Assignment effectuated a complete transfer of all his real property interests; (3) Husband did not record the Assignment until after Husband and Wife commenced di-

*Seaton,* 904 P.2d 412 (Alaska 1995); *Soldano v. Soldano,* 66 A.D.2d 839, 411 N.Y.S.2d 395, 398 (N.Y.App.Div.1978) (conveyance by husband, in anticipation of wife's action for divorce and to prevent her from recovering alimony, is fraudulent and may be set aside unless purchaser took without notice and for value). *See also* Uniform Fraudulent Transfer Act, Hawai'i Revised Statutes chapter 651C (1993).[2] Additionally, any conveyance by Husband after February 24, 1992 would have violated the terms of the family court's February 24, 1992 Stipulated Order for Pre Decree Relief (Stipulated Order).

### B.

It was Husband's position at trial that he held no ownership interest in the home at the time divorce proceedings commenced because he and Mother had executed the Assignment on May 2, 1988, transferring their leasehold interests in the home to Daughter. To constitute a valid conveyance, however, the Assignment must have been delivered to Daughter, since "[i]t is delivery which gives the instrument force and effect." *Boteilho v. Boteilho,* 58 Haw. 40, 44, 564 P.2d 144, 147 (1977); *see also Tougas v. Tougas,* 76 Hawai'i 19, 868 P.2d 437 (1994) ("[t]o constitute a gift, ... there must be: (1) donative intent; (2) *delivery;* and (3) acceptance") (emphasis added).

What amounts to delivery is a question of law, and whether delivery has actually been made is a question of fact. *Boteilho,* 58 Haw. at 46, 564 P.2d at 148. Delivery of a conveyance document may be actual or constructive, and is deemed complete when the grantor: (1) intends that the document "become presently effective to convey title," and (2) "by ... words or conduct has relinquished all right of control over the document, reserving no right to recall or to alter it." *Id.* While manual transfer of a conveyance document to the grantee is the "best evidence of delivery," it is not an absolute requirement. *Id.* Moreover, the "fact of recordation of an instrument constitutes prima facie evidence of delivery, although it is not conclusive evidence thereof." *Id.* at 44, n. 1, 564 P.2d 144.

In this case, the record is undisputed that on May 14, 1992, after divorce proceedings had already commenced, Husband recorded at the Bureau of Conveyances the previously unrecorded Assignment. Since the recordation of the Assignment would constitute prima facie evidence of its delivery by Husband to Daughter, I believe that the family court was correct in concluding that Husband's recordation effectuated a "transferring, encumbering, wasting, or otherwise disposing of any real property" in violation of the Stipulated Order prohibiting such dissipation of the marital estate. Therefore, I disagree

vorce proceedings; (4) Husband recorded the Assignment even though neither he nor Mother obtained Bishop Estate's requisite consent to the Assignment; and (5) the Assignment transaction, which appears to be a gift by Husband to Daughter, took place between close relatives.

2. Under the Uniform Fraudulent Transfer Act, Hawai'i Revised Statutes (HRS) chapter 651C, factors that may be considered in determining whether a conveyance was made with actual intent to hinder, delay, or defraud any present or future creditor of a debtor include whether:
   (1) The transfer or obligation was to an insider;
   (2) The debtor had retained possession or control of the property transferred after the transfer;
   (3) The transfer or obligation was disclosed or concealed;
   (4) Before the transfer was made or obligation was incurred, the debtor was sued or threatened with suit;
   (5) The transfer was of substantially all the debtor's assets;
   (6) The debtor had absconded;
   (7) The debtor had removed or concealed assets;
   (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
   (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
   (10) The transfer had occurred shortly before or shortly after a substantial debt was incurred; and
   (11) The debtor had transferred the essential assets of the business to a lienor who had transferred the assets to an insider of the debtor.
   HRS § 651C–4 (1993). In addition to the indicia of fraud discussed in footnote 1, the record reveals that after executing the alleged Assignment, Husband continued to retain possession or control of the home, and as the trial judge found, continued to hold himself out to third parties as the owner of the home.

with the majority that the family court erred when it declared the recorded Assignment a "nullity and of no effect for purposes of the ... proceeding."

### C.

The majority expresses "no opinion as to the ultimate effect the court should give the Assignment on remand" and states that "any possible defects in the Assignment instrument must be raised and resolved on remand." Majority opinion at 612.

However, relying on HRS § 502–82 (1993) and HRS § 502–83 (1993), as well as *Bottomley v. Hall*, 18 Haw. 412 (1907), and *Chun Chew Pang v. Chun Chew Kee*, 49 Haw. 62, 73, 412 P.2d 326, 332 (1966), the majority states that "under appropriate circumstances a recorded instrument may be submitted as prima facie evidence of the conveyance," and "a certificate of acknowledgment complete and regular on its face raises a rebuttable presumption that the facts stated therein are true." Majority opinion at 612.

I disagree that the Assignment document should be accorded a presumption of validity in this case. Contrary to the express terms of the original lease between The Trustees of the Estate of Bernice Pauahi Bishop (Bishop Estate), as lessors, and Husband, Mother, and Daughter, as lessees, Husband, Mother, and Daughter never obtained Bishop Estate's consent to the Assignment. Additionally, despite the fact that on February 16, 1988, Husband, Mother, and Daughter had already purchased from Bishop Estate, on agreement of sale, the fee simple interest in the home, Husband never assigned/conveyed his fee simple interest in the home to Daughter by the May 2, 1988 Assignment document.

Since Husband is claiming that the Assignment effectuated a valid conveyance of his interest in the home to Daughter, the burden should rest with him to prove the validity of the conveyance. *Gabaig v. Gabaig*, 717 P.2d at 841.

### D.

Notwithstanding the foregoing, since the family court's Stipulated Order specifically allowed Husband to offer proof at trial that "he owns no interest of any kind or nature in the aforesaid property," Record on Appeal (R.A.), vol. 1, at 209, I believe that Husband should have been allowed to introduce the *unrecorded* Assignment into evidence at the trial below and to offer proof that the unrecorded Assignment effectuated a valid conveyance of Husband's interests in the home to Daughter. I therefore do not agree with the majority that the October 15, 1992 Order was in error because it applied the Stipulated Order retrospectively and resulted in inconsistent application.