967 P.2d 686

**The QUEEN'S MEDICAL CENTER, Plaintiff–Appellant,**

v.

**June Tokiyo KAGAWA, Defendant–Appellee.**

**No. 21034.**

Intermediate Court of Appeals of Hawai'i.

Sept. 23, 1998.

Reconsideration Denied Oct. 7, 1998.

Mark D. Clement, Honolulu, on the briefs, for plaintiff-appellant.

Judith Ann Pavey (Pavey & Glickstein), Honolulu, on the brief, for defendant-appellee.

Before WATANABE, ACOBA AND KIRIMITSU, JJ.

ACOBA, Judge.

We hold that pursuant to the plain and unambiguous terms of Hawai'i Revised Stat-

utes (HRS) § 572–24 (1993), the spousal liability statute, Defendant–Appellee June Tokiyo Kagawa (Wife) is liable to pay for "necessaries," in this case, services which were provided by Plaintiff–Appellant The Queen's Medical Center (QMC) to her now deceased husband, Wendell I. Kagawa (Husband). In our view, such a construction comports with the underlying purposes of the spousal liability statute, which are to enforce the duty owed by husband and wife to support each other, to encourage providers of goods and services to extend necessaries to needy spouses, and to compensate providers for such goods and services. Accordingly, we vacate the July 21, 1995 findings of fact (findings), conclusions of law (conclusions), and judgment, and the September 10, 1997 final judgment of the first circuit court (the court) ordering Wife to pay QMC a sum in the amount of $18,500, Husband's anticipated proceeds if a divorce action between Wife and Husband had been completed, as satisfaction of Husband's debt. We remand the case for a determination of the amount to be awarded QMC for its services in light of our opinion.

## I.

### A.

The case was tried on June 19, 1995 by stipulating to documents in the court record.[1] As best can be ascertained, the following matters are relevant.

Husband and Wife (collectively, the Kagawas) were married in 1977. During the course of the marriage, Wife claimed to be primarily responsible for the Kagawas' sustenance. According to Wife, she paid the majority of the Kagawas' expenses, with Husband occasionally contributing to the payment of utility and grocery bills. Initially, Wife included Husband as a covered person under her health insurance policy (the

policy) with the Hawaii Medical Service Association (HMSA).

A few years after the marriage began, Wife discontinued her joint checking account with Husband. From this point forward, Wife indicated that the Kagawas maintained separate finances and assets, and that at no point in the marriage did she loan or give Husband money.

In July 1989, Wife informed Husband that she wanted to obtain a divorce, and requested that he vacate the marital residence. Wife stated she informed Husband that she was going to "remove" him from the policy, and that he should obtain his own health insurance coverage. The only direct evidence that Husband agreed to obtain his own health insurance coverage came from Wife's testimony at her deposition. Through her employer, Wife requested that Husband be removed from the policy. In 1990, Wife discovered that, "mistakenly," Husband's name had not been deleted from the policy. Wife soon thereafter personally ensured that Husband's coverage under the policy was terminated. There is no evidence as to whether Husband attempted to secure his own health insurance coverage at that time.

Wife filed a complaint for divorce on March 11, 1991. On May 31, 1991, Wife signed an "Agreement Incident to Divorce" (the agreement), which Husband also signed on June 3, 1991.[2] The undated agreement stated that "[e]ach party shall be responsible for and shall assume and pay his or her respectively-incurred debts, and shall indemnify and hold the other party harmless from any claims made against the non-responsible party." Husband also signed a "Waiver of Appearance," stating that he had no objection to the family court entering a final decree of divorce without his presence. Wife delivered the agreement and the Waiver of

---

**1.** In lieu of conducting a live trial, the parties agreed to "stipulate to the record as it exists[.]" The stipulated record consisted of "all pleadings[,] motions[,] and memorand[a] in opposition that [had] been filed ... as well as [the affidavits and] the exhibits that [were] attached to the affidavits[,]" and depositions. Since none of the witnesses testified, the first circuit court (the court) did not have the opportunity to observe

the demeanor of the witnesses and the record which was before it is the same as that on appeal.

**2.** The "Agreement Incident to Divorce" was entered as Exhibit 1 during the September 7, 1994 deposition of Defendant–Appellee June Tokiyo Kagawa (Wife).

Appearance to her divorce lawyers by June 3, 1991.

### B.

On June 5, 1991, Husband required emergency hospitalization and was admitted to QMC. QMC acknowledged that Husband's admission was considered "urgent," and that he would have been admitted regardless of his insurance coverage, marital status, or ability to pay the bill.

Although not made a part of the findings, the record reflects that Mr. Liuone Faagai, a patient registrar for QMC, testified that in an urgent care situation, the patient's physician will contact the hospital's "bed control department" to ascertain whether there is any available bed space. If there is availability, "in anticipation" of the patient's arrival, QMC will determine if there is "an account already available," and will "reactivate [the] old account." This way, QMC has simply to "go over all of the information" with the patient to verify its accuracy. Mr. Faagai further testified that "[a]ccording to [his] standard practice and training, [he] confirmed all of the information contained in [the "Authorization for Admission and Treatment Form" (the admission form)] with [Husband]."

The admission form states Husband's marital status as "married" and his "next of kin" as Wife. It also lists Husband's "first insurance" as HMSA and his "second insurance" as "self-pay." [3] Mr. Faagai asserted in a June 16, 1995 affidavit, that "[he] prepared the [a]dmission [f]orm prior to [Husband's] arrival at the hospital by retrieving most of the information from the computer system. The fact that the information was already available on the computer means that [Husband] must have been treated at [QMC] on a prior occasion."

Mr. Faagai stated "that [he] reviewed the entire [a]dmission [f]orm with [Husband],

and he confirmed/verified that all of the information contained therein was accurate and current." Although Mr. Faagai "[could] not specifically remember [Husband]," he based his testimony on "routine procedures that [he] would follow[.]"

The court also made no finding as to whether Husband presented an HMSA insurance card to QMC at the time of his admission. However, according to Mr. Faagai's affidavit, "[Husband] presented an insurance card indicating that he had insurance with HMSA. A copy of the card was made and put into [his] file." The card, attached as "Exhibit 2" to Mr. Faagai's affidavit, listed the "Subscriber" as Wife. The membership number of "9567041" was indicated on the face of the card, as was the group number of "42519." "Family" was written in the "contract" box of the card, and the plan was effective in July 1986. The date on the bottom of the card read "9/16/87," but it is not clear from the record as to what this date refers.

When Husband was admitted to QMC, he and Wife were not physically separated. Wife testified at her deposition that she asked Husband to secure his own residence, but that he had continued to reside at the marital residence until his hospitalization. Upon discovering that Husband had no hope of recovery, Wife testified that she found it unnecessary to pursue a divorce action against someone who would soon be deceased.

"[A] few days prior to [Husband's] demise," Wife notified her attorney that she wished to terminate the divorce action. The agreement that had been signed by Husband and Wife was thus never filed in court. According to Wife, financial liability for debts incurred by Husband "never entered [her] mind." The divorce proceeding against Husband was dismissed on September 14, 1991.[4]

---

3. According to Rae Ann Leong, the manager of patient financial services for Plaintiff–Appellant The Queen's Medical Center (QMC), Wendell I. Kagawa (Husband) did not necessarily indicate that he would be secondarily liable for the bill, because "regardless of what [Husband] did or didn't say and regardless of whether he showed an insurance card or not, the box [on the 'Authorization for Admission and Treatment Form'] that says second insurance name and address is going to say self[-]pay because the computer is going to make i⟨ say self[-]pay."

4. On September 14, 1991, Wife filed a "Suggestion of Death and Ex–Parte Motion to Dismiss Action" concerning the divorce proceedings. On

On June 25, 1991, approximately three weeks after his admission to QMC, Husband passed away, leaving a hospital debt of $151,-870.65. Wife claimed that QMC did not inquire into Husband's health insurance coverage or his ability to pay additional uncovered expenses during Husband's hospitalization or immediately following his death. Again, although not made a part of the findings, Rita Albina, a patient account representative for QMC, testified she typically waits to contact the family of a deceased patient concerning an outstanding debt "to give them time to do the burial and get over their grief." She stated that generally, there is "no reason to call [the family] right when the patient passes away [to] discuss bills with them." According to Wife, QMC contacted her about Husband's debt approximately three months after his death.

### C.

After Wife refused to pay QMC for Husband's hospital stay, QMC commenced an action to recover payment for Husband's medical services plus interest, costs, and attorney's fees.

QMC filed its first motion for summary judgment on December 16, 1993. In its supporting memorandum, QMC first argued, as it similarly maintains on appeal, that "[HRS] § 572–24 imposes a mandatory duty on [Wife] to pay the debts contracted by [Husband] for medical treatment."

On February 3, 1994, Wife filed a cross-motion for summary judgment. In her supporting memorandum, she argued that Hawai'i has traditionally looked to "all of the facts and equities of the situation" in determining whether one spouse should be held liable for the debts of the other spouse. She maintained that the Kagawas were on the "verge of divorcing[,]" and that they had "all but completed their divorce when [Husband] was taken ill." According to Wife, her removal of Husband from the policy "manifest[ed] the couple's intent that each person would be responsible for their [sic] own medical expenses." Further, Wife argued that

QMC relied solely on Husband's credit when it admitted him, precluding QMC from seeking payment from Wife. In her brief, Wife discussed traditional contract rules of reliance and mistake, arguing that QMC should bear the risk of its mistake concerning Husband's insurance coverage since they "took his 'word' that he had valid HMSA coverage." Lastly, Wife claimed that she would suffer "significant hardship" if she were forced to pay Husband's bill.

QMC filed its opposition memorandum on April 12, 1994, contending that in the absence of a final decree of divorce, the Kagawas remained married, and thus Wife was "liable for 'all debts contracted by [Husband] for necessaries ... *during* their marriage.'" (Quoting HRS § 572–24; emphasis and ellipses in original.)

The court denied QMC's motion on May 5, 1994, and Wife's motion on May 6, 1994.

After both parties had an opportunity to engage in discovery, each again filed motions for summary judgment. Wife filed her second summary judgment motion on June 13, 1995. In her supporting memorandum, Wife reiterated her initial arguments, and additionally claimed that "[QMC] ha[d] admitted that it would have admitted [Husband] exactly as it did regardless of his insurance or marital status[,] because he was what [QMC] call[ed] an 'urgent admission.'"

QMC filed its cross-motion for summary judgment on June 16, 1995. In its supporting memorandum, QMC also reiterated its initial argument and added that it had "relied on the marital status of [Husband] as a prospect for payment on his account." In response to Wife's argument that QMC would have admitted Husband regardless of his marital status or insurance coverage, QMC asserted that even though Husband "would have been admitted and treated if he were single and uninsured[,] ... this [did] not eliminate the fact that [QMC] relied on [Husband's] marital status as a prospect for payment[.]" QMC noted that it is "precluded from delaying the provision of emergency

September 19, 1991, the family court of the first circuit issued an ex-parte order dismissing the action.

care in order to inquire about the individual's method of payment or insurance status." [5] Rather than ruling on the second summary judgment motions, the court proceeded to trial.

### D.

Because trial evidence was received by way of stipulation, the court heard only oral argument from each party prior to issuing its decision. The court entered its findings and conclusions on July 21, 1995. The following findings are relevant to this appeal: [6]

3. Other than paying for certain household items, [Wife] did not financially support [Husband].

4. [Wife] never loaned or gave [Husband] money.

5. In July 1989 [Wife] informed [Husband] that she wanted a divorce. At that time[,] she informed him that she was taking him off of her medical insurance and they discussed the fact that he should obtain his own insurance.

6. [Husband] was actually removed from [Wife's] insurance one year later in 1990 due to an oversight by her workplace.

7. For all intents and purposes [Wife] and [Husband] had been living separate lives since July 1989 with the understanding that they were to be divorced.

. . . .

10. By May 31, 1991[,] [Husband] had already signed [the agreement] which ex-

pressly stated that each party would be responsible for their [sic] own debts.

. . . .

15. Nowhere on the admission form is it indicated that [Wife] would be responsible for [Husband]'s bill. [Wife] never saw or signed this form.

. . . .

17. [QMC] would have admitted and treated [Husband] exactly as it did regardless of either his marital or insurance status.[7]

18. [Wife] was never contacted by [QMC] regarding [Husband]'s bill during his hospitalization from June 5, 1991 to June 25, 1991.

19. [QMC] also took no steps to verify [Husband]'s claimed coverage with HMSA during his hospitalization. If it had, such verification would have more likely than not triggered an investigation by [QMC] into alternative sources of payment[8] including notice to [Wife] of her potential liability for [Husband]'s hospital bill.

. . . .

23. [Wife's] divorce attorney did not mention anything about the spousal liability statute [HRS § 572–24,] nor did he inform [Wife] that the divorce could be expedited and entered nunc pro tunc to preserve the intent of the parties.[9]

The court made the following conclusions that are pertinent to this appeal:

"relevant" for purposes of determining its claim. Findings 21 and 24 stated as follows:

> 21. [QMC] first contacted [Wife] regarding [Husband's] hospital bill several weeks after his death.
> . . . .
> 24. [Wife] felt that there was no sense in divorcing a deceased person and out of respect for [Husband's] mother, agreed to dismiss the divorce action.

---

5. QMC, in its second motion for summary judgment, cited the Federal Emergency Medical Treatment and Active Labor Act, which is codified in 42 U.S.C.A. § 1395dd, at 954, as authority for this proposition.

 In the affidavit of Carol Lee, Director of Admitting and Business Services, which was attached to QMC's second motion for summary judgment, Ms. Lee stated that "based on [an article discussing 42 U.S.C.A. § 1395dd], it is [her] understanding that a hospital is strictly precluded from delaying provision of an appropriate medical screening examination or further medical treatment in order to inquire about the individual's method of payment or insurance status." Neither the court nor the parties indicate whether the statute addresses the question of payment for the services rendered.

6. In its opening brief, QMC states that findings of fact (findings) 17, 19, 21, 23, and 24 were not

7. The court did not indicate what, if any, effect this would have on Wife's liability for payment.

8. The court did not identify the "alternative sources of payment." .

9. We express no opinion as to the relevance or correctness of this finding or its implied legal conclusion "that the divorce could be expedited and entered nunc pro tunc."

1. *The spousal liability statute, HRS [§ ] 572–24, does not give rise to absolute liability in every case.* Where the facts of the case make it clear that the purposes underlying the spousal liability statute would not be served by a strict construction and application of the statue [sic], then the [c]ourt shall examine the facts of the particular case.

2. *Case law encourages the court to look to the reality of the marital relationship* and the nature of the contract between the person seeking to collect a debt and the person from whom they are seeking to collect it.

3. *Other factors to be considered by the [c]ourt are the viability of the marriage, any indication that the couple separated in order to avoid the debt and whether the couple is, in fact, a financial unit.*

4. The facts of this case, as viewed in the context of these legal principles, confirm that the parties intended to be divorced and had taken the necessary steps to effect that end. According to the executed divorce document, the parties had agreed to be responsible for their own debts and neither was to pay any support to the other except for $20,000.00 [Wife] agreed to pay [Husband] of which $1,500.00 had already been paid. . . .

. . . .

6. The [c]ourt finds that the Kagawa's [sic] marriage was not viable. . . .

7. The Kagawa's [sic] were not a financial unit. . . .

8. The [c]ourt finds that the public policy underlying the spousal liability statute would not be served by applying it to the special and unusual facts of this case.

(Emphases added.)

On July 31, 1995, Wife withdrew her second motion for summary judgment. On Au-

**10.** Hawai'i Revised Statutes (HRS) § 572–24 (1993) states, in its entirety, that

[b]oth spouses of a marriage, whether married in this State or in some other jurisdiction, and residing in this, shall be bound to maintain, provide for, and support one another during marriage, and shall be liable for all debts contracted by one another for necessaries for themselves, one another, or their family during

gust 17, 1995, QMC withdrew its second motion for summary judgment. QMC noticed its appeal on August 21, 1995.

## II.

■ QMC essentially challenges the court's conclusions 1 through 3 relating to the application of HRS § 572–24, the spousal liability statute, and the court's ruling that the statute should "not be . . . strictly construed." The standard employed by this court in reviewing conclusions of law is the right/wrong standard. *See, e.g., Wharton v. Hawaiian Elec. Co. Inc.,* 80 Hawai'i 120, 122, 906 P.2d 127, 129 (1995); *Nelson v. Boone,* 78 Hawai'i 76, 80, 890 P.2d 313, 317 (1995). In applying the right/wrong standard, we review the court's legal conclusions de novo.

"[W]here the language of a statute is plain and unambiguous, construction by [the] court is inappropriate and [the court's] duty is to give effect to its plain and obvious meaning." *Strouss v. Simmons,* 66 Haw. 32, 50, 657 P.2d 1004, 1016 (1982) (citations, quotation marks, and brackets omitted). HRS § 572–24 states, in relevant part, as follows:

Both spouses of marriage . . . shall be bound to maintain, provide for, and support one another during marriage, and *shall be liable for all debts contracted by one another for necessaries for themselves,* one another, or their family *during marriage;* provided that when a support or maintenance obligation, however designated, is imposed upon a spouse under chapter 580 or any other law, the amount of such obligation shall be determined by the appropriate court [.] [10]

(Emphases added.)

QMC argues that under the plain language of HRS § 572–24 each spouse is liable for all debts for necessaries of the other spouse until the final dissolution of marriage.[11]

marriage; provided that when a support or maintenance obligation, however designated, is imposed upon a spouse under chapter 580 or any other law, the amount of such obligation shall be determined by the appropriate court on the basis of factors enumerated in section 580–47(a) [ (1993) ].

**11.** HRS § 572–23 (1993), which precedes HRS § 572–24 and is entitled, "Not Liable for Spousal

Thus, it maintains that the court's "departure from the plain language of [HRS § 572–24] is totally inappropriate and is not supported by . . . the case law interpreting it." Wife does not assert that HRS § 572–24 is ambiguous.

 Evident from the plain language of the statute is the legal command that each spouse "shall be bound to maintain, provide for, and support" the other spouse and "shall be liable for all debts contracted by one another for necessaries . . . during marriage." There is no dispute that Husband's medical services were necessaries for which he was indebted to QMC. The debt was contracted for during the period when Husband was married to Wife. Under the terms of HRS § 572–24, Wife thus became "liable" for the QMC debt incurred by Husband. We hold, therefore, that absent an "appropriate court" order, Wife was liable to QMC for Husband's debt for necessaries under the plain and obvious terms of HRS § 572–24. We conclude that this construction of the statute is supported, also, by its underlying purposes.

### III.

### A.

At common law, the doctrine of "necessaries" was invoked when "the husband fail[ed] or refuse[d] to supply his wife or child with necessaries[.]" 1 Clark, *The Law of Domestic Relations in the United States* 445 (2d ed.1988). In that case, "the wife or child [could] purchase them, [or] charg[e] them to the husband, [thereby making him] liable to the supplier for their cost." *Id.* Under this doctrine, the husband was made directly responsible to the supplier of necessaries on "restitution or quasi-contract" principles:

> *According to what became the doctrine of necessaries, the husband was thereby made responsible directly to the merchant who supplied the goods to the wife or child.* In some early cases this procedure was referred to as the wife's agency by necessity, perhaps as a fictional way of lending respectability to the doctrine of necessaries, perhaps out of confusion between that doctrine and agency. *The fact is, however, that the doctrine of necessaries is not a doctrine of agency at all. The husband is liable for his wife's necessaries regardless of whether he authorized or apparently authorized her to buy them. His liability is imposed by law, on principles of restitution or quasi-contract,* in order to provide wives and children with support, and is not dependent upon his consent. The wife may also be liable for necessaries purchased by her.

*Id.* at 444 (emphases added) (footnotes omitted).

Debts," states, "A married person is not liable for the debts of a spouse; nor is a married person's property liable to be taken on execution or other process against that person's spouse."

This statutory provision was codified in 1888, at the same time as the predecessor to the Spousal Liabilities Statute. The original provision provided that "[a] married woman shall not be liable for the debts of her husband; nor shall her property be liable to be taken on execution or other process against him, except as provided in Section 10 of this Act." 1888 Sess. L., Act 11, § 6, at 29. Section 10 of Act 11 concerns "[w]hen a married woman does, or proposes to do, business on her separate account[.]" 1888 Sess. L., Act 11, § 10, at 30. The language of the statute remained the same until 1945 when the Hawai'i Territorial Legislature deleted the last clause of the statute. 1945 Sess. L., Act 254, § 2, at 310. Thus, the statute read, "A married woman shall not be liable for the debts of her husband; nor shall her property be liable to be taken on execution or other process against him." *Id.*

The language remained unchanged until 1978, when HRS § 573–6, the predecessor statute, was amended to make it gender-neutral; the statute was amended to read, "A married *person* is not liable for the debts of a *spouse;* nor is a married *person's* property liable to be taken on the execution of other process against that person's *spouse.*" 1978 Sess. L., Act 77, § 1(1), at 100 (emphases added). No reason is given for the amendment except Article I, Section 21, of the Constitution of the State of Hawai'i, which provides that "[e]quality of rights under the law shall not be denied or abridged by the state on account of sex[,]" is referenced in the committee reports. Hse. Stand. Comm. Rep. 309–78, in 1978 House Journal, at 1526.

In light of the legislature's silence on the distinction between HRS § 572–23, under which a spouse is *not* liable for the other spouse's debts, and HRS § 572–24, under which a spouse *is* liable for the other spouse's debts incurred for necessaries, a *pari materia* reading of the statutes would appear to indicate that the reciprocal obligations between spouses to pay the debts of the other spouse applies with respect to necessaries only.

## B.

A husband's liability for necessaries was first discussed by the Supreme Court of the Hawaiian Islands in *Luka v. Poohina,* 5 Haw. 695 (1876). The supreme court stated that "the husband will continue [to be] liable for necessaries supplied to the wife, until the fact that she has withdrawn herself from his protection has become notorious." *Id.* at 696. In *Luka,* the wife had left her husband because of his alleged adulterous conduct. *Id.* at 695. The husband attempted to free himself from liability to a third-party for her debts by claiming that she, too, had engaged in adulterous behavior. *Id.* No proof was adduced that the wife had, in fact, engaged in adulterous conduct, and the supreme court "presumed that none [could] be offered." *Id.* at 697. Since the husband failed to prove that the separation was the wife's fault, he was held liable for necessaries provided to his wife. *Id.*

In *Kupele v. Kahananui,* 6 Haw. 212 (1877), the wife and husband were living apart, and the plaintiff, a "tradesman," knew of their separation. *Id.* The plaintiff admitted that he "gave credit to the wife when he supplied her with the goods in question." *Id.* The supreme court ruled that a husband was not liable to pay the plaintiff for the goods contracted by his wife, reasoning that a husband will be "discharged from liability where it appears that the goods were not supplied in his credit[.]" *Id.* (internal quotation marks omitted).

Six years later, the supreme court decided *Kekoa v. Borden,* 5 Haw. 23 (1883), where the plaintiff, an attorney who provided services to the wife, sought to recover payment from the husband. Referring to the common-law version of the doctrine of necessaries,[12] the supreme court stated that "[i]n suits for necessaries[,] recoveries are allowed upon the ground that the wife is the agent of the husband to contract for them." *Id.* Further, "the [burden] is on the plaintiff to show that the husband ha[d] refused his wife prop-

er support at home, or he cannot recover." *Id.* For a husband to be relieved of his duty to pay for his wife's necessaries, the plaintiff must demonstrate that "[the] wife abandon[ed] her husband without justifiable cause or commit[ted] adultery for which he turn[ed] her away, or voluntarily liv[ed] apart from him in adultery, or otherwise dwel[t] separate from him without his consent or fault[.]" *Id.* The supreme court concluded that "[t]he plaintiff failed to show any proper separation or any misconduct of the husband," thereby precluding recovery. *Id.* at 24.

The supreme court further discussed the extent of a husband's liabilities in *Forrester v. Hurtt,* 18 Haw. 215, *reh'g denied,* 18 Haw. 256 (1907). In *Forrester,* the plaintiff-physician sued the husband for medical services provided to the wife at a time when the husband and the wife were living apart. *Id.* Unknown to the plaintiff at the time he rendered his services, the husband had agreed to pay the wife a "certain sum monthly." *Id.* at 216. The trial court had ruled in favor of the husband because it found that although the husband had not been making the payments to the wife, the plaintiff knew the husband and the wife had separated "by reason of the wife's fault." *Id.*

On appeal, the supreme court described the extent of a husband's liability as follows:

> A husband is bound to support his wife, and, if he refuses to do so, *one who furnishes necessaries to the wife on the credit of the husband may recover from him the reasonable value thereof.* But where the husband and wife are living separate and apart, one [who] furnishes necessaries to the wife [does so] at his peril and must show, among other things, in order to recover, that the wife was in need of the necessaries, that the husband failed to supply her with them, and that she had authority to bind her husband, that is, that she was justified in living apart from her husband.

---

12. The earliest Hawai'i codification of the doctrine of necessaries did not occur until 1888. That statutory provision stated, in relevant part, that "[a] husband ... shall be bound to maintain, provide for and support his wife during marriage

... and shall be liable for all the debts contracted by his wife for necessaries for herself or family during marriage[.]" 1888 Haw. Sess. L., Act 11, § 7, at 29.

*Id.* (emphasis added). The supreme court ordered a new trial to ascertain whether the husband was "refusing to adequately support his wife himself while she was living apart from him with his consent[,]" thereby making him "liable under such circumstances[.]" *Id.* at 217.

In *Ing v. Chung,* 34 Haw. 709 (1938), the action was based on the spousal liability statute, Revised Laws of Hawai'i (RLH) 1935 § 4651.[13] The supreme court ruled that the husband should be liable for debts "contracted by [the wife] for such necessaries upon the credit of her husband, in which event the rule of 'enforced agency' or 'agency by necessity' is applied *unless the wife has, by her conduct, forfeited her right to support by her husband* [,]" or the couple's separation was not a result of "mutual consent or . . . occasioned by the fault or misconduct of the husband." *Id.* at 712–13 (emphasis added). The supreme court characterized RLH § 4651 as "merely" imposing a legal duty upon the husband, and cautioned that a husband would not be subjected to liability for his wife's debts if she was not justified in living apart from him. *Id.* at 712–14.

### C.

The earlier cases discussed *supra* followed past rules established in Anglo–American law for the proper behavior of husbands and wives in marriage. *See* Clark, *supra,* at 423. Such rules were "regarded as moral precepts." *Id.* at 424. Thus, "fault ha[d] always been a highly relevant issue in non-support cases" and "usually arose by way of defense" by the spouse sued:

> The cases held that the wife's adultery or her desertion or abandonment of her

husband excused him from providing her with support. Even if he was the one who left home, he had a defense to her claims if she had by her conduct made cohabitation intolerable or prevented it without justification. On the other hand the wife could prevail if she could show that the separation was not her fault. If the parties separated by mutual consent, or as the result of fault on both sides, the wife was held not to be entitled to support, at least in some states. Though the husband was originally in the wrong by having deserted or abandoned his wife, if he made a bona fide offer of reconciliation which she refused without justification, he had a defense. The same principle operated in the wife's favor if she made an offer of reconciliation.

*Id.* at 429–30 (footnotes omitted).

 In Hawai'i, as in many states, *see id.* at 431, fault is no longer a consideration in assessing support obligations between a husband and wife. *See Horst v. Horst,* 1 Haw. App. 617, 624, 623 P.2d 1265, 1270–71 (1981) (holding that "fault pertaining to personal conduct" of the parties towards each other is not a factor in determining which spouse has a better claim to property in a divorce proceeding). *See also Markham v. Markham,* 80 Hawai'i 274, 287, 909 P.2d 602, 615 (App.) (holding that evidence of a wife's extramarital relationship was irrelevant to property division in an action for divorce), *cert. denied,* 80 Hawai'i 357, 910 P.2d 128 (1996).

 Thus, to allow fault to govern liability under HRS § 572–24 would contradict the notion that fault should not be considered when evaluating the financial obligations of a husband and wife to each other.[14] QMC is

---

**13.** Revised Laws of Hawai'i (RLH) 1935 § 4651 was one of several subsequent renumberings of 1888 Haw. Sess. L., Act 11, § 7.

In 1925, the 1888 Sess. L. Act 11, § 7 was reenacted as RLH 1925 § 3000. RLH § 3000 was identical to § 7 of the 1888 Act 11, except RLH § 3000 included a provision for intestate succession in the event a wife predeceased her husband. RLH § 3000 was amended in 1933, but only with respect to the intestate succession portion.

In 1935, the statute was renumbered in RLH 1935 § 4651. The language of RLH § 4651 was identical to RLH § 3000. RLH § 4651 stated, in

relevant part, that "[a] husband . . . shall be bound to maintain, provide for and support his wife during marriage . . . and shall be liable for all the debts contracted by his wife for necessaries for herself or family during marriage[.]"

**14.** Some jurisdictions have held that common law exceptions based on misconduct of the parties remain in effect despite statutes abolishing fault as a factor in marriage dissolution proceedings. *See Bartrom v. Adjustment Bureau, Inc.,* 618 N.E.2d 1 (Ind.1993). The reasoning of the Indiana Supreme Court is that the legislature was "aware of the common law, and [did] not

thus correct in asserting that "however valid the [fault] exception may have been in the earlier part of this century, it is unquestionably not in keeping with the modern trend toward providing for spousal support and divorce, regardless of the fault of the parties." Allowing one spouse to be relieved of support obligations because of the wrongful conduct of the other spouse would be contrary to Hawai'i's current approach to family law.

■ Moreover, HRS § 572–24 is couched in gender-neutral terms, and thus no longer renders only the husband liable for debts incurred during the marriage. The statute mandates that each spouse is liable for the other spouse's debts for necessaries without regard to gender.[15] Hence, the statute imposes a legal reciprocal obligation on each spouse to pay for the necessaries of the other spouse. The imposition of mutual obligations of support on both husbands and wives is in accord with the approach adopted in the majority of states. Clark, *supra,* at 433.[16]

## IV.

Wife urges us, however, to follow the analysis in *National Account Sys. v. Mercado,* 196 N.J.Super. 133, 481 A.2d 835 (N.J.Super.Ct.App.Div.1984). In *Mercado,* an assignee of a hospital debt (creditor) sought payment from the wife for medical expenses incurred by her deceased husband. *Id.* at 836. The creditor argued that the "marriage between [the wife] and the decedent 'subsisted' at the time of the hospitalizations." *Id.* at 837.

Concluding that the "only basis for imposition of liability on [the wife was] that resulting as a matter of law from her relationship to the decedent," *id.* at 836, the New Jersey Court of Appeals held that "in some circumstances a marriage will cease to subsist for purposes of liability[.]" *Id.* at 837. Although the couple had never divorced, the court believed their marriage no longer "subsisted" for purposes of spousal liability. *Id.* at 837–38.

*Mercado* identified several factors relevant to its rule: "the couple had been separated for four years and were not supporting each other[;]" the marriage was not viable at the time of the husband's hospitalizations; the couple was "not a financial unit" at the time the debt was incurred; and the hospital "could not have reasonably assumed that [the wife's] assets would be available for payment of its bill." *Id.*

Although the court in the instant case did not make any findings concerning the reasonableness of QMC's expectation that Wife would "be available" to pay Husband's bill, it did make findings similar to the factors set

intend to make any change[s] therein...." *Id.* at 10.

**15.** HRS § 572–24 was preceded by other statutory embodiments of the necessaries doctrine.

In 1945, RLH 1935 § 4651, *see supra* n. 13, was renumbered as RLH 1945 § 12372. The language in the 1945 statute was identical to that in the 1935 statute. In 1955, RLH § 12372 was recodified as RLH 1955 § 325–7. The only change made to the statute in 1955 was that the intestate succession portion of RLH § 12372 was omitted from RLH § 325–7. In 1968, RLH § 325–7 was recodified HRS § 573–7 (1968). HRS § 573–7 was renumbered as § 572–24 in 1984. 1984 Haw. Sess. L. Act 79, § 2, at 133.

HRS § 573–7, which preceded HRS § 572–24, was amended in 1978 to make the statute gender-neutral, thereby imposing liability on each spouse for necessaries contracted by the other. 1978 Haw. Sess. L. Act 77, § 1, at 100. The Senate Standing Committee, in 1978, stated that "[HRS § 573–7] does not appear to meet the constitutional standard because, in the case of

ongoing marriages, by making the husband solely responsible in every case for family support, it discriminates on the basis of sex." Sen. Stand. Com. Rep. No. 720–78, in 1978 Senate Journal, at 1088.

**16.** Modern case law concerning the doctrine of necessaries focuses on whether the doctrine should apply to wives as well as husbands. Many jurisdictions have not enacted a spousal liability statute, but have developed gender-neutral versions of the doctrine through case law. *See, e.g., St. Francis Reg'l Med. Ctr., Inc. v. Bowles,* 251 Kan. 334, 836 P.2d 1123 (Kan. 1992); *Medical Business Assocs. v. Steiner,* 183 A.D.2d 86, 588 N.Y.S.2d 890 (App.Div.1992); *Jersey Shore Med. Ctr.–Fitkin Hosp. v. Estate of Baum,* 84 N.J. 137, 417 A.2d 1003 (N.J.1980); *Richland Memorial Hosp. v. Burton,* 282 S.C. 159, 318 S.E.2d 12 (S.C.1984). Thus, a substantial portion of such cases is devoted to discussing the shift of imposing liability to both spouses. This is not an issue in the instant case, because the Hawai'i legislature has amended the statute to make it gender-neutral.

forth in *Mercado*. Wife urges, then, that we look beyond the "during marriage" directive of HRS § 572–24, and determine whether a viable marriage existed between Husband and Wife, applying the *Mercado* factors. She asserts that if, as a matter of fact, a marriage relationship has ceased to exist, then a spouse should be excused from any duty imposed under HRS § 572–24. Nothing, however, in the words of HRS § 572–24 or in its legislative history, would support judicial exploration into the viability of a marriage for the purpose of determining the existence of a spouse's duty under the statute.

## V.

■ On the other hand, we believe there are substantial reasons supporting the view that during marriage a spouse must be obligated to pay for necessaries provided to his or her spouse. We find persuasive the propositions that requiring spouses to support each other would promote the provision of needed necessaries, including medical care to a spouse by health care providers, and that providers of necessaries should be fairly compensated for the benefits afforded needy spouses.

## A.

In *North Carolina Baptist Hosps. v. Harris*, 319 N.C. 347, 354 S.E.2d 471, 472 (N.C. 1987), a case cited by QMC, the husband was admitted to a hospital and the wife "declined to sign as guarantor." When the husband was unable to pay his hospital bill, the hospital brought a claim against the husband, since he was the debtor, and against the wife, pursuant to the doctrine of necessaries. *Id.* at 471. The trial court granted the hospital's motion for summary judgment on the claim against the husband but dismissed the complaint against the wife for failure to state a cause of action. *Id.*

On appeal, the wife had argued that "a gender-neutral application of the doctrine [of necessaries] would be better accomplished by abolishing [it] altogether." *Id.* at 474. The North Carolina Supreme Court acknowledged that "[t]he traditional allocation of marital rights and duties was based at least

in part on the legal disability of married women to manage their own financial affairs." *Id.* at 472. However, it recognized that the modern "trend toward gender neutrality" should modify the "gender-biased rule requiring a husband to pay for the necessaries of his wife, but relieving her of a reciprocal duty." *Id.* at 474.

In rejecting the wife's argument that the doctrine should be entirely abolished, the North Carolina court explained that "[t]he doctrine has historically served several beneficial functions. Among these are the encouragement of health-care providers and facilities to provide needed medical attention to married persons and the recognition that the marriage involves shared wealth, expenses, rights, and duties." *Id.* Thus, it concluded that "the benefits to the institution of marriage will be enhanced by expanding rather than abolishing the doctrine of necessaries[,]" and recognized that there is "a personal duty of each spouse to support the other, a duty arising from the marital relationship itself and carrying with it the corollary right to support from the other spouse." *Id.*

The factors listed by the North Carolina court to establish a prima facie case for establishing liability for necessary medical services were as follows:

(1) medical services were provided to the spouse;

(2) the medical services were necessary for the health and well-being of the receiving spouse;

(3) the person against whom the action is brought was married to the person to whom the medical services were provided at the time such services were provided; and

(4) the payment for the necessaries ha[d] not been made.

*Id.* at 475. The facts adduced at trial and stipulated to by the parties satisfied the requisite factors, thus entitling the hospital to recover the costs of the medical services from the wife. *Id.*

## B.

Similarly, South Carolina has held that the doctrine may be "relied upon by creditors" to

recover payment for health services provided. *Trident Reg'l Med. Ctr. v. Evans*, 317 S.C. 346, 454 S.E.2d 343, 346 n. 2 (S.C.Ct. App.1995). In *Evans*, a series of collection actions was brought by a hospital against debtor wives and non-debtor husbands. *Id.* at 344. At trial, the hospital alleged that while the wives had incurred the debts, the husbands were liable under the doctrine of necessaries. *Id.* The trial court entered default judgments against the wives, but denied default judgments against the husbands. *Id.*

On appeal, the hospital apparently argued that the common law doctrine made the husbands liable for their spouses' medical expenses. *Id.* The appellate court agreed that the doctrine of necessaries provided "creditors [an] incentive to provide necessary goods and services to a married woman, [and] ... helped to ensure that a married woman could meet her basic needs and those of her family." *Id.* The South Carolina court noted that "the necessaries doctrine historically ha[d] been a creditor's remedy, encouraging the extension of credit to married women by allowing the creditor to proceed against the husband." *Id.* at 346 n. 2. "By allowing a creditor to [rely on it], the necessaries doctrine encourages health care facilities and other suppliers to provide products and services necessary for the well-being of a family[.]" *Id.* at 345.

The South Carolina Court of Appeals concluded, thus, that "[t]he actions required of a creditor [in obtaining payment] ... should further the objectives of the doctrine, and should not be so burdensome as to discourage creditors from providing necessaries to married persons." *Id.* It therefore established the following requirements for a creditor pursuing payment from a "liable spouse":

(1) necessaries were provided to the spouse;

(2) the person against whom the action is brought was married to the person to whom the necessaries were provided at the time the necessaries were provided; and

(3) despite demand therefor, payment for the necessaries ha[d] not been made by the person to whom the necessaries were provided.

*Id.*

 We concur in that court's opinion that creditors may be hesitant to extend necessaries to a spouse if the creditors' ability to recover payment from the other spouse is precluded or significantly hindered.[17] We therefore do not believe HRS § 572–24 should be construed in a manner which would create uncertainty as to its applicability. A definite and clearly defined spousal duty, in our view, best informs husbands and wives of the extent of their obligations under HRS § 572–24 and encourages providers to extend necessaries to needy spouses.

Even were this rationale challenged,[18] we believe that *after* necessaries are provided, the provider should be compensated for its goods or services by the person benefitted or by the person upon whom the legal obligation to render payment may have legally devolved as the provider historically was reimbursed at common law. *See, e.g.,* Clark, *supra,* at 444. *See also* Annotation, *Husband's Liability to Third Person for Necessaries Furnished to Wife Separated From Him,* 60 A.L.R.2d 7, 18 (1958) (stating that liability under the doctrine is "based on the law of restitution, which, in turn, is largely based on the rules concerning unjust enrichment" and that "one who supplies necessaries is considered as having *conferred a benefit* upon the husband for which the law raises, on the part of the husband, an implied promise to pay") (emphasis added).

## VI.

### A.

QMC further argues that the court erroneously relied on *Bartrom v. Adjustment Bu-*

---

**17.** We are not directly presented with the question of what would constitute the prima facie requirements for an action to recover payments for necessaries provided pursuant to HRS § 572–24. However, we believe the like formulations of such requirements in *North Carolina Baptist Hosps. v. Harris*, 319 N.C. 347, 354 S.E.2d 471 (N.C.1987), and *Trident Reg'l Med. Ctr. v. Evans,*

317 S.C. 346, 454 S.E.2d 343 (S.C.Ct.App.1995), would satisfy the terms of HRS § 572–24.

**18.** The court found that QMC would have treated Husband "regardless of either his marital or insurance status." This finding, however, begs the question of liability for the cost of such treatment.

*reau, Inc.,* 600 N.E.2d 1369 (Ind.Ct.App. 1992) (*Bartrom I* ), because that decision was later vacated by the Indiana Supreme Court in *Bartrom v. Adjustment Bureau, Inc.,* 618 N.E.2d 1 (Ind.1993) (*Bartrom II* ). Hence, QMC asserts, the court in the instant case incorrectly relied on *Bartrom I*'s holding that spousal liability is extinguished after an action for divorce has begun.

In that case, the· wife left the marital residence because of her husband's "repeated abuse of alcohol and repeated acts of physical and mental abuse towards her." *Bartrom II,* 618 N.E.2d at 2. Shortly thereafter, the wife filed for divorce. *Id.* Only days after the wife filed for divorce, the husband was involved in a motor vehicle accident requiring hospitalization. *Id.* The hospital contacted the wife a few days after the husband was admitted, asking her to "execute an agreement to pay for the treatment of her husband[.]" *Id.* at 3. She refused. Following her husband's death, she inherited his assets through the right of survivorship. *Id.* Since the hospital was thus precluded from recovering from the husband's estate, it sought payment from the wife. *Id.*

The hospital argued in its motion for summary judgment that the wife was liable for her husband's hospital debts under the doctrine of necessaries. The wife filed a cross-motion for summary judgment in which she argued, inter alia, that her liability for her husband's debts terminated on the date of their separation. The trial court granted the hospital's motion, and denied the wife's motion. *Id.* at 3. However, the Indiana Court of Appeals reversed the trial court's ruling and remanded with instructions to grant the wife's motion for summary judgment, holding that "one spouse is not liable for the debts of another spouse when a [p]etition for [d]issolution of [m]arriage has been *filed* [.]" *Bartrom I,* 600 N.E.2d at 1374 (emphasis added).

The Indiana Court of Appeals in *Bartrom I* relied, in part, on *Mercado,* concluding that "Indiana law clearly states that equitable distribution takes place at the date of final separation," and that "[a]s the court in *Mercado* reasoned, the date for equitable distribution is the determining factor in spousal liability." *Id.*

### B.

We agree that the court was in error in relying on *Bartrom I.* The Indiana Supreme Court in *Bartrom II* vacated the decision of the Indiana Court of Appeals, and held that a "spouse may look to the other for support pending the final dissolution of the marriage." *Bartrom II,* 618 N.E.2d at 9. The supreme court stated that the court of appeals was "mistaken in its belief that the date of final separation generally governs 'equitable distribution.'" *Id.* at 8. Rather, the supreme court concluded that the *"pendency* of dissolution proceedings will not shield the financially superior spouse from liability which would otherwise exist." *Id.* at 9 (emphasis added). Thus, the *Bartrom II* court held that "the duty of spousal support continues at least until the marital relationship is dissolved." *Id.*

■ We concur with the Indiana Supreme Court that the statutory duty of spousal support for necessaries continues past the filing of a divorce action, and absent some interim court order concerning "support or maintenance" as provided in HRS § 572–24, remains in effect until the final disposition of divorce proceedings. This court concluded in *Markham* that "the termination point of the marriage partnership for purposes of property division is the conclusion of the divorce trial." *Markham,* 80 Hawai'i at 287, 909 P.2d at 615. In *Markham,* we held that the trial court's "use of the separation date as the termination point of the marriage relationship for the purpose of property division was incorrect[,]" and pointed out that a "final division of marital property can be decreed only when the partnership is dissolved and not after a declaration by either spouse that the marriage has ended." *Id.* (internal quotation marks, citations, and brackets omitted).

■ That same reasoning is applicable to the case at bar. Spousal liability does not cease to exist when the parties declare that it no longer exists. Marriage is also an economic partnership, and the duties and obligations of the parties terminate when the partnership legally terminates. Thus, Wife's

filing of a divorce action did not end Wife's duty to Husband, or her liability for his debts under HRS § 572–24.

### C.

Other jurisdictions with statutory versions of the doctrine have sustained the liability of one spouse for necessaries provided to the other spouse in the absence of a final decree of divorce or a court order of support or maintenance.

In *St. Luke's Medical Ctr. v. Rosengartner*, 231 N.W.2d 601, 602 (Iowa 1975), the Iowa Supreme Court held that only a "dissolution [of the marriage] or separate maintenance" will relieve a spouse of the duty to support under the doctrine. The Iowa spousal liability statute, similar to HRS § 572–24, stated, in relevant part, that " [t]he reasonable and necessary expenses of the family ... are chargeable upon the property of both husband and wife, or either of them, and in relation thereto they may be sued jointly or separately.'" *Id.* (quoting Iowa Code § 597.14 (1975)).[19] In *Rosengartner*, the husband was held liable for his wife's medical expenses, despite their "living apart by agreement." *Id.* The Iowa court reasoned that "a spouse cannot so easily cast off his or her responsibility to third persons for obligations incurred by the other spouse for items which are of the character of family expenses." *Id.*

In *St. Mary of Nazareth Hosp. v. Kuczaj*, 174 Ill.App.3d 268, 123 Ill.Dec. 745, 528 N.E.2d 290 (Ill.App.Ct.1988), the Illinois appellate court upheld a hospital's claim to recover payment from the non-debtor spouse pursuant to Illinois' Family Expense Statute.[20] The statute stated, in relevant part, that " [t]he expenses of the family ... shall be chargeable upon the property of both husband and wife, or of either of them, in favor of creditors therefor, and in relation thereto they may be sued jointly or separate-

ly.'" *Id.* 123 Ill.Dec. at 749, 528 N.E.2d at 294 (quoting Ill.Rev.Stat. ch. 40, para. 1015 (1987)). The Illinois court determined that the husband was liable to the hospital for his wife's medical expenses despite the couple's final decree of divorce, noting the debt was incurred prior to a final dissolution of the marriage. *Id.* Despite the couple's separation at the time the debt was incurred, the Illinois court held that "[a] husband may be liable for expenses incurred by a wife irrespective of whether they were living separately[.]" *Id.*, 123 Ill.Dec. at 749, 528 N.E.2d at 294.

The Nebraska Supreme Court in *Nichol v. Clema*, 188 Neb. 74, 195 N.W.2d 233 (Neb. 1972), held that a wife was liable for medical services provided to her husband. The basis for such liability was a Nebraska statute that stated, in relevant part, that " 'all property of a married woman ... shall be liable for the payment of all debts contracted for necessaries furnished the family of said married woman after execution against the husband for such indebtedness has been returned unsatisfied[.]' " *Id.* at 234 (quoting Neb. R.R.S. § 42–201 (1943)). The court confirmed that the wife was liable, because "despite [the couple's] strained relationship, [they were] in fact husband and wife." *Id.* at 235. Since the wife had been "unsuccessful in her efforts to obtain a divorce[,]"[21] the wife could not be relieved of liability for her husband's debts. *Id.*

### VII.

### A.

Having concluded that the court erred in its construction of HRS § 572–24, we see no basis for any judicial consideration of "factors" listed by the court, including that of the viability of the marriage or the presence or absence of a "financial unit." Under our construction of the statute, Wife's obligation

---

**19.** Although not characterized as a "family expense statute," the language of the Iowa statute is similar to the family expense statute in Illinois. *See* n. 20 *infra.*

**20.** Family expense statutes are rooted in the common law doctrine of necessaries. Typically, such statutes "impose[ ] upon the wife, or upon

her property, liability for family expenses, [but do] not absolve the husband of the ultimate responsibility for support of the wife and children." 1 Clark, *The Law of Domestic Relations in the United States* 433–34 (2d. ed.1988).

**21.** The opinion is unclear as to why the wife could not obtain a divorce.

would not be vitiated by the court's findings that QMC would have admitted and treated Husband "regardless of either his marital or insurance status." [22] Since Wife was statutorily liable for Husband's necessities, QMC also was not obligated to conduct an "investigation ... into alternative sources of payment." [23] Additionally, because a spouse's obligation to support the other spouse endures until the dissolution of the marriage, the fact that Husband and Wife lived "separate lives" (although sharing the same marital residence), that their marriage was "not viable," and that they had completed papers in contemplation of a divorce, would not be dispositive of Wife's liability for Husband's necessities.

We are not unmindful of the amount of the debt owed. However, HRS § 572–24 embodies a doctrine of necessaries that has existed in this jurisdiction from the time when Hawai'i was an independent and sovereign nation. We fail to see how any action by QMC would have expanded on the "notice ... of [Wife's] potential liability" than that already given by the statute.

### B.

While our holding has resolved the issue of Wife's liability for Husband's medical debt pursuant to HRS § 572–24, we are unable to determine from the record whether QMC is entitled to the total amount of damages it claims. The trial court, having reached the conclusion that Wife was not liable for Husband's debts, never tried or reviewed the nature and reasonableness of QMC's charges for medical services.

The only evidence in the record concerning the specific nature of the debt amassed at QMC consists of the itemized bill QMC generated for Husband's treatment. This bill was attached to QMC's motions for summary judgment. We do not find it conclusive of QMC's entitlement to the amount requested. In order for QMC to recover payment for all medical expenses incurred by Husband, it must be able to demonstrate that each charge was necessary for Husband's care and reasonable, and therefore recoverable. Thus, this case must be remanded to the trial court for a determination of the amount owed QMC under the interpretation of HRS § 572–24 adopted herein.

### VIII.

For the foregoing reasons, we vacate the July 21, 1995 findings, conclusions, and judgment, and the September 10, 1997 final judgment and remand for proceedings consistent with this opinion.

---

**22.** The effect of this finding on liability for payment of Husband's treatment is not made clear in the record. *See* n. 5, 7, and 18.

**23.** Our holding obviously does not preclude a reduction of the debt owed QMC by payments from any other available contributory sources.